**Theodore A. PINNOCK, Plaintiff,**

v.

**INTERNATIONAL HOUSE OF PANCAKES FRANCHISEE, et al., Defendants.**

**Majid ZAHEDI doing business as International House of Pancakes, Counterclaimant,**

v.

**Theodore A. PINNOCK, and Does 1 Through 50, Counterdefendants, and**

**The United States of America, Counterdefendant– Intervenor.**

**Civ. No. 92–1370–R (CM).**

United States District Court, S.D. California.

Nov. 8, 1993.

Theodore A. Pinnock, Law Offices of Theodore A. Pinnock and Hugh D. Kelso, III, San Diego, CA, for plaintiff/counterdefendant.

Peter Lepiscopo, Law Offices of Peter Lepiscopo, San Diego, CA, for defendant/counterclaimant.

Joseph Russo, U.S. Dept. of Justice, Washington, DC, for U.S.

AMENDED ORDER DENYING DEFEN-
DANT'S MOTION FOR SUMMARY
JUDGMENT AND GRANTING
CROSS–MOTION BY UNITED
STATES FOR SUMMARY JUDG-
MENT ON CONSTITUTIONAL
CHALLENGES [1]

RHOADES, District Judge.

## I. Background

Plaintiff, Theodore A. Pinnock ("Pinnock") filed the complaint in this action against Defendant, Majid Zahedi, owner of an International House of Pancakes franchise ("Zahedi").[2] Pinnock, an attorney representing himself, is unable to walk and uses a wheelchair. Pinnock dined at the defendant's restaurant on June 21, 1992, and then attempted to use the restroom. The entrance to the restroom, however, was not wide enough to admit his wheelchair. Pinnock therefore removed himself from his wheelchair and crawled into the restroom. As a result of this encounter, Pinnock alleges nine causes of action against Zahedi. Five of the causes of action arise under state law, alleging violations of the state health and safety code, the Unruh Civil Rights Act, and infliction of emotional distress. The remaining four causes of action are alleged under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"), arising from Zahedi's alleged failure to comply with the statute's provisions governing access for disabled individuals in public accommodations ("title III").[3]

Zahedi presented twenty-five affirmative defenses in his answer to the complaint. Among these, and at issue here, are allegations that the ADA violates numerous provisions of the United States Constitution. Zahedi filed a compulsory counterclaim for Declaratory Judgment on the constitutional challenges pursuant to 28 U.S.C. §§ 1331 and 2201. The United States intervened pursuant to rule 24(a) of the Federal Rules of Civil Procedure and 28 U.S.C. § 2403, to defend the constitutionality of the ADA, and filed a cross-motion for summary judgment on the constitutional issues. As no court has yet considered the constitutional challenges raised by Zahedi, these motions call upon the Court to decide questions of first impression.

## II. Zahedi is a Member of an Industry Which Affects Interstate Commerce and is Properly Regulated by Title III

■ Zahedi argues that Congress does not have constitutional authority to regulate his facility, asserting that title III of the ADA exceeds the powers granted Congress by the U.S. Constitution. Congress enacted title III pursuant to Article I, Section 8, of the United States Constitution, which grants Congress the power to "regulate Commerce ... among the several States" and to enact all laws necessary and proper to this end. U.S. CONST., art. I, § 8, cls. 3, 18; *Katzenbach v. McClung*, 379 U.S. 294, 301–02, 85 S.Ct. 377, 382, 13 L.Ed.2d 290 (1964). The Supreme Court has consistently held that Congress is empowered under the Commerce Clause to regulate not only interstate activities, but also intrastate activities that substantially affect interstate commerce. *See, e.g., McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980); *Perez v. United States*, 402 U.S. 146, 151, 91 S.Ct. 1357, 1360, 28 L.Ed.2d 686 (1971) (citing *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942)); *Wickard v. Filburn*, 317 U.S. 111, 122–25, 63 S.Ct. 82, 87–89, 87 L.Ed. 122 (1942); *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819).

The Commerce Clause allows Congress to regulate any entity, regardless of its individual impact on interstate commerce, so long as the entity engages in a class of activities that affects interstate commerce. *Russell v. United States*, 471 U.S. 858, 862, 105 S.Ct. 2455, 2457, 85 L.Ed.2d 829 (1985); *Hodel v.*

---

1. The Court's Amended Order is issued for purposes of publication and shall be entered *nunc pro tunc*.

2. On December 20, 1993, Zahedi's restaurant was destroyed by fire. Zahedi, along with two co-defendants, has been charged with Damaging and Destroying Property in and Affecting Interstate Commerce, in violation of 18 U.S.C. § 844(i), and Using Fire to Commit a Felony, in violation of 18 U.S.C. § 844(h).

3. The ADA is comprised of separate titles that regulate in the areas of employment (title I), Public Services (title II), and Public Accommodations (title III). Title III governs private businesses which meet the characteristics of a public accommodation as specified in section 12181(7) of the ADA. *See* 42 U.S.C. § 12181(7).

*Virginia Surface Min. & Reclamation Ass'n,* 452 U.S. 264, 277, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (citing *Fry v. United States,* 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975)); *Perez,* 402 U.S. at 151–54, 91 S.Ct. at 1360–61. As the Supreme Court stated in *United States v. Darby,* Congress has "recognized that in present day industry, competition by a small party may affect the whole and that the total effect of the competition of many small producers may be great." 312 U.S. 100, 123, 61 S.Ct. 451, 461, 85 L.Ed. 609 (1941). *See also Wickard,* 317 U.S. at 128–29, 63 S.Ct. at 90–91.

Courts must defer to congressional findings that an activity affects commerce, so long as there is a rational basis for such a finding. *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360; *Katzenbach,* 379 U.S. at 303–04, 85 S.Ct. at 383 (1964). As the Supreme Court recognized in the context of racial discrimination, the restaurant industry unquestionably affects interstate commerce in a substantial way. In *Katzenbach,* the Court noted,

> discrimination in restaurants ha[s] a direct and highly restrictive effect upon interstate travel by Negroes. This resulted . . . because discriminatory practices prevent Negroes from buying prepared food served on the premises while on a trip, except in isolated and unkempt restaurants and under most unsatisfactory and often unpleasant conditions. This obviously discourages travel and obstructs interstate commerce for one can hardly travel without eating.

379 U.S. at 300, 85 S.Ct. at 381–82. Thus, regardless of Zahedi's individual circumstances, he is subject to Commerce Clause regulation as a member of the restaurant industry.

■ Even aside from its membership in an interstate industry, Zahedi's restaurant demonstrates characteristics which place it squarely in the category of interstate commerce. It is a franchise of a large, international, publicly traded corporation ("IHOP Corp."), organized under Delaware law. IHOP Corp. had total retail sales of $479 million in 1992, operates 547 franchises in thirty-five states, Canada, and Japan, and employs 16,000 persons.[4] Furthermore, Zahedi's restaurant is located directly across the street from State Highway 163, and within two miles of two interstate highways. There are three hotels within walking distance, and three motels within one and one-half miles of the restaurant.[5] The courts have found these facts to be indicia of a business operating in interstate commerce. *See Katzenbach,* 379 U.S. at 300–01, 85 S.Ct. at 381–82 (restaurant on state highway, 11 blocks from interstate highway, affected commerce); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 243, 85 S.Ct. 348, 350, 13 L.Ed.2d 258 (1964) (motel two blocks from downtown road and "readily accessible" to two intrastate and two interstate highways affected commerce); *Miller v. Amusement Enters., Inc.,* 394 F.2d 342, 345 (5th Cir.1968) (amusement park 150 yards from interstate highway affected commerce).

Congressional enactment of title III of the ADA was well within Congress' power to regulate interstate commerce under the Commerce Clause. As part of the restaurant industry, Zahedi is subject to the provisions of title III, which by its own terms, reaches as broadly as the Commerce Clause permits.[6] As a member of the restaurant industry and as an individual enterprise which caters to travelers, Zahedi's restaurant is properly regulated by title III of the ADA.

### III. Title III of the ADA is Not Unconstitutionally Vague

Zahedi argues that many of the terms used in section 12182(b)(2) of title III are unconstitutionally vague and are therefore in violation of the Due Process Clause of the Fifth Amendment. Statutes which fail to adequately specify the actions or conduct necessary to conform with the law pose problems

---

4. *See* IHOP Corp. 1992 Annual Report, 2–3, 8.

5. *See* Declaration of Sean M. Flynn ("Flynn Declaration"), attached as Exhibit D, ¶¶ 9–12.

6. Title III covers, *inter alia,* "public accommodations," which are defined by a list of type of facilities whose operations "affect commerce." 42 U.S.C. § 12181(7) (Supp. II 1990). In addition, the ADA's statement of purpose states that it intends "to invoke the sweep of congressional authority, including the power . . . to regulate commerce." *Id.* § 12101(b)(4).

for which the Supreme Court has expressed serious concern.[7] However, the terms with which Zahedi takes issue do not deprive private businesses of the ability to steer between lawful and unlawful conduct. To the contrary, the statute, its preamble, the legislative history, and the accompanying guidelines provide more than ample explanation of the statute's application.

## A. Statutes Regulating Commercial Activity are Subject to Lower Standards of Specificity

■ Vagueness challenges are considered under varying standards, depending upon the nature of the statute. Statutes which threaten to inhibit freedom of speech or other constitutionally protected rights face a more stringent vagueness test. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 & n. 7, 102 S.Ct. 1186, 1192 & n. 7, 71 L.Ed.2d 362 (1982); *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). Criminal statutes, in general, face a higher vagueness standard than do civil statutes: "The Court has ... expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. at 1193. *See Winters v. New York*, 333 U.S. 507, 515, 68 S.Ct. 665, 670, 92 L.Ed. 840 (1948) (where a statute imposes criminal penalties, the standard of certainty is higher).[8]

■ By contrast, purely economic regulations are subject to lower standards of specificity. In *Hoffman Estates*, the Supreme Court held that:

> [E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.... Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

455 U.S. at 498, 102 S.Ct. at 1193; *see also Grayned*, 408 U.S. at 109, 92 S.Ct. at 2299 (1972); *Chalmers v. City of Los Angeles*, 762 F.2d 753, 757 (9th Cir.1985).

■ Title III of the ADA is a civil statute regulating commercial conduct.[9] As such, Zahedi can successfully sustain its challenge only if he can prove that the enactment specifies "no standard of conduct ... at all." *Hoffman Estates*, 455 U.S. at 489 & n. 7, 102 S.Ct. at 1186 & n. 7. *See also Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971) (invalidating criminal statute found to be vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all."); *Boutilier v. Immigration*

---

7. *See Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972).

8. The Court has noted that the primary rationale for imposing stricter standards upon criminal statutes is

> not actual notice, but ... the requirement that a legislature establish minimal guidelines to govern law enforcement.... Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."

*Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (citing *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974)). The Court found that the statute at issue in that case "vest[ed] virtually complete discretion in the hands of the police...." *Id.*

Title III, by contrast, poses no such threat, as the ADA is not enforced as a criminal statute.

9. Zahedi argues that title III should be subjected to the higher standards of specificity which apply to "quasi-criminal" statutes because the statute authorizes imposition of up to $50,000 in civil penalties. Zahedi states no authority for this proposition. In *Hoffman Estates*, the Court emphasized that the ordinance "simply regulates business behavior," but found, nonetheless, that the challenged language was sufficiently clear under the more stringent test appropriate to either a quasi-criminal or a criminal law. The *Hoffman Estates* Court considered the ordinance under the "quasi-criminal" standard due to the fact that the proponents of the statute had taken the position that the ordinance was "quasi-criminal." The ordinance regulated the sale of drug paraphernalia and required purchasers to register their names. 455 U.S. at n. 16, 102 S.Ct. at n. 16.

*and Naturalization Service,* 387 U.S. 118, 121, 87 S.Ct. 1563, 1570, 18 L.Ed.2d 661 (1967) (to violate due process, a statute must be "so vague and indefinite as really to be no rule or standard at all").

## B. Limiting Constructions Offered by the Department of Justice are Properly Considered

■■■ In evaluating a vagueness challenge, a court should consider the words of the ordinance, interpretations given to analogous statutes, and "the interpretation of the statute given by those charged with enforcing it." *Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300. *See also Hoffman Estates,* 455 U.S. at n. 5, 102 S.Ct. at n. 5 (in reviewing a statute for vagueness, a federal court must consider limiting constructions proffered by an enforcing agency.); *Ward v. Rock Against Racism,* 491 U.S. 781, 795, 109 S.Ct. 2746, 2756, 105 L.Ed.2d 661 (1989) (same). Administrative regulations and interpretations may provide sufficient clarification for statutes that might otherwise be deemed vague. *United States v. Schneiderman,* 968 F.2d 1564, 1568 (2d Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1283, 122 L.Ed.2d 676 (1993); *see, e.g., Hoffman Estates,* 455 U.S. at 502, 504, 102 S.Ct. at 1195, 1196; *Fleming v. USDA,* 713 F.2d 179, 184 (6th Cir.1983).

■■■ Zahedi argues that the limiting constructions offered by the Department of Justice should not be considered when examining the statute for vagueness because none of the cases cited by the Government involve federal statutes. While it is true that the provisions considered in *Grayned, Hoffman Estates,* and *Ward* were state or municipal statutes rather than federal statutes, Zahedi has offered no basis for differentiating between state and federal statutes in this context. There is no language in either *Grayned, Hoffman Estates* or *Ward* indicating that the Supreme Court intended to exclude federal statutes from the benefit of limiting constructions. Furthermore, such a distinction is contrary to reason: when federal and state statutes are challenged on the same constitutional grounds, they should be held to the same standard. The reasons for applying limiting constructions to state stat-

utes apply with equal force to federal statutes. Therefore, the limiting constructions offered by the Department of Justice and the title III Technical Assistance Manual, which are available to the public, are properly considered.

## C. Each of the Challenged Terms, When Considered in Conjunction With Limiting Constructions, is Sufficiently Precise

In *Grayned,* the Supreme Court upheld a challenged statute that was "marked by 'flexibility and reasonable breadth, rather than meticulous specificity' " noting that "we can never expect mathematical certainty from our language." 408 U.S. at 110, 92 S.Ct. at 2300. Likewise, the terms of title III are marked by well-reasoned flexibility and breadth. When considered in conjunction with the Department of Justice guidelines, these terms are not unconstitutionally vague.

### 1. Readily Achievable Barrier Removal

■■■ Title III requires existing places of public accommodation to remove architectural barriers to access, where such removal is "readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv) (Supp. II 1990). The term is defined in the statute as "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9) (Supp. II 1990). The statute enumerates four factors to consider when determining whether a modification is readily achievable, and the legislative history lists examples of the types of changes Congress believes are readily achievable. These include specific examples for small stores and restaurants such as rearranging tables and chairs and installing small ramps and grab bars in restrooms. *See* U.S. Mem. in Support of Cross Mot. for Sum. J. at n. 27 (citing 42 U.S.C. § 12181(9) (Supp. II 1990)).

In addition, the federal regulation further elucidates the term "readily achievable" by adding other factors. These include the overall financial resources of the parent corporation and safety requirements. 28 C.F.R. § 36.104, at 460–61 (1991). The regulation lists 21 examples of barrier removal likely to be "readily achievable" in many circumstances, such as installing ramps and reposi-

tioning shelves and telephones. *See id.* § 36.304(b), at 466, & app. B, at 576–77.

Finally, the preamble to the regulation provides further explanation and notes that use of a more specific standard would contravene the goals of the ADA:

> the Department has declined to establish in the final rule any kind of numerical formula for determining whether an action is readily achievable. It would be difficult to devise a specific ceiling on compliance costs that would take into account the vast diversity of enterprises covered by the ADA's public accommodation requirements and the economic situation that any particular entity would find itself in at any moment.

*Id.* at § 36.104, app. B, at 577.

These specifications easily met the requirements for economic regulation announced in *Hoffman Estates.*

### 2. Alternatives to Barrier Removal

■ Title III provides that where barrier removal is not readily achievable, a covered entity must make its goods or services available through "alternative methods if such methods are readily achievable." 42 U.S.C. § 12182(b)(2)(A)(v) (Supp. II 1990). The legislative history, the regulation itself, and the preamble all provide specific examples of appropriate alternatives to barrier removal. These include providing curb service or home delivery, coming to the door of the facility to handle transactions, serving beverages at a table for persons with disabilities where a bar is inaccessible, providing assistance to retrieve items from inaccessible shelves, and relocating services and activities to accessible locations. Senate Report at 66; 28 C.F.R. § 36.305(b), at 467–68, app. B, at 599 (1991). These provisions also meet the specificity requirements for economic regulations.

### 3. Reasonable Modifications of Policies and Procedures

■ The statute requires public accommodations to:

> make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services . . . to individuals with disabilities,

unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

42 U.S.C. § 12182(b)(2)(A)(ii) (Supp. II 1990). Zahedi argues that the phrases "reasonable modifications" and "fundamentally alter" are unconstitutionally vague.

Illustrations of the term "reasonable modifications" are provided in the title III regulation and its preamble. For example, stores in which all of the checkout aisles are not accessible are required to ensure that an adequate number of accessible checkout aisles are left open at all times. *See* 28 C.F.R. § 36.302(d), at 465 (1991). Likewise, facilities that do not permit entry to animals would be required to modify such policies as they apply to service animals accompanying disabled individuals. *Id.* § 36.306(c), at 465.

The preamble to the title III regulation contains a lengthy explanation of the concept of fundamental alteration, and explains that the "rule does not require modifications to the legitimate areas of specialization of service providers." 28 C.F.R. pt. 36, app. B, at 592 (1991). The preamble also provides an example of an acceptable referral to another provider who specializes in a requested service. *Id.*

Furthermore, as the Government points out, the term "fundamentally alter" has been previously used in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). That decision construed section 504 of the Rehabilitation Act of 1973, which prohibits discrimination on the basis of disability in federally assisted or operated programs or activities. In *Davis,* the Court concluded that programs did not discriminate if they failed to make accommodations that would "fundamentally alter" the nature of the program. *Id.* at 409, 99 S.Ct. at 2368. The terms "reasonable modifications" and "fundamental alteration" are therefore not unconstitutionally vague.

### 4. Most Integrated Setting Appropriate

■ Title III requires covered entities to afford their goods and services to an individual with a disability "in the most integrated

setting appropriate to the needs of the individual." 42 U.S.C. § 12182(b)(1)(B) (Supp. II 1990). The preamble to the title III regulation provides two pages of examples and explanations illustrating the meaning of this provision. One example provides that

> it would be a violation of this provision to require persons with mental disabilities to eat in the back room of a restaurant or to refuse to allow a person with a disability to full use of a health spa because of stereotypes about the person's ability to participate.

28 C.F.R. pt. 26, app. B, at 581. The legislative history provides further illustration, noting that the "integrated settings" provision is intended to prevent segregation based on fears and stereotypes about persons with disabilities. H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. II, at 102 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 385 ("House Report, Pt. II"); *see also id.* pt. III, at 56–57 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 479–80 ("House report, Pt. III"). The term "most integrated setting appropriate," as used in title III, is not unconstitutionally vague.

### 5. Undue Burden

■ Under title III, public accommodations are required to provide auxiliary aids in order to extend their services to persons with disabilities, unless to do so would pose an "undue burden" to the covered entity or would "fundamentally alter" the nature of its goods or services. 42 U.S.C. § 12182(b)(2)(A)(iii) (Supp. II 1990). The term "undue burden" is defined in the regulation as a "significant difficulty or expense." 28 C.F.R. § 36.104, at 461 (1991) (definition of "undue burden"). The regulation lists factors for determining whether a particular action will create an undue burden. These are the same factors as those provided for assessing whether an action is "readily achievable." *Id.* The preamble, however, clarifies that:

> "[R]eadily achievable" is a lower standard than "undue burden" in that it requires a lower level of effort on the part of the public accommodation.... [A] public accommodation is not required to provide any particular aid or service that would result in either a fundamental alteration in

the nature of the goods, services, facilities, privileges, advantages, or accommodations offered or in an undue burden. Both of these statutory limitations are derived from case law under section 504 [of the Rehabilitation Act of 1973] and are to be applied on a case-by-case basis ...

*Id.,* app. B, 576, 595 (discussing definition of "undue burden" in § 36.104). Furthermore, the regulation is supplemented by discussion in the Technical Assistance Manual, which provides explanations of both "undue burden" and "fundamental alteration." *See* U.S. Depart. of Justice, The Americans with Disabilities Act—Title III Technical Assistance Manual at 27–28 (1992 & Supp.1993).

### 6. Full and Equal Enjoyment and Opportunity to Participate

■ Title III's general prohibition against discrimination provides as follows:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation....

42 U.S.C. § 12182(a) (Supp. II 1990). Zahedi claims that the phrase "full and equal enjoyment" is impermissibly vague. However, the next subsection of the statute, entitled "Construction" enumerates categories of actions that constitute such discrimination. These categories include denying a person with a disability public accommodations, or providing accommodations not equal to that afforded to other individuals.

Furthermore, the legislative history explains that

> [f]ull and equal enjoyment does not encompass the notion that persons with disabilities must achieve the identical result or level of achievement of nondisabled persons, but does mean that persons with disabilities must be afforded equal opportunity to obtain the same result.

Senate Report at 60. Thus, the terms "full and equal enjoyment" are given ample operational definition, as are the specific subsections of this provision that Zahedi challenges. As the government argues, the prohibition

584

denying individuals with disabilities an "opportunity to participate in or benefit from" the goods or services of a covered entity clearly means that persons with disabilities may not be excluded from receiving the services of a place of public accommodation.

## IV. Title III is Not Retroactive Legislation

■ Zahedi challenges the ADA on the grounds that it is retroactive legislation and therefore violates the Due Process Clause of the Fifth Amendment. Zahedi takes issue with the Government's failure to distinguish *Campbell v. Holt,* 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885) and *Retirement Board v. Alton R. Co.,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). However, as the Government notes, the Court more recently addressed the issue of retroactivity in *Federal Housing Administration v. Darlington, Inc.,* 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), *reh'g denied,* 358 U.S. 937, 79 S.Ct. 310, 3 L.Ed.2d 311 (1959). In that case, the Court rejected a due process challenge to a statute which directed the Federal Housing Administration ("FHA") to insure mortgages only for strictly residential housing, rather than transient housing which had been previously included. The Court held that application of the statute to an existing apartment facility which no longer qualified for mortgages under the new law did not contravene the Due Process Clause. In holding that the amended statute was only prospective in effect the Court stated:

> [F]ederal regulation of future action based upon rights previously acquired by the person regulated is not prohibited by the Constitution. So long as the Constitution authorizes the subsequently enacted legislation, the fact that its provisions limit or interfere with previously acquired rights does not condemn it.

358 U.S. at 91, 79 S.Ct. at 146 (quoting *Fleming v. Rhodes,* 331 U.S. 100, 107, 67 S.Ct. 1140, 1144, 91 L.Ed. 1368 (1947)). *See also United States v. Manufacturers Nat'l Bank,* 363 U.S. 194, 200, 80 S.Ct. 1103, 1107, 4 L.Ed.2d 1158 (1960).

The fact that title III applies to existing places of public accommodation does not render the statute retroactive. Congress routinely acts to regulate existing businesses, programs, and structures, imposing new guidelines which reflect the changing social and environmental standards of our democratic system. The fact that such legislation affects existing entities does not insulate responsible parties from compliance with the law.

The relevant inquiry is whether the legislation imposes *liability or penalty* for conduct occurring prior to the effective date of the statute. "The determination of whether a statute's application in a particular situation is prospective or retroactive depends upon whether the conduct that allegedly triggers the statute's application occurs before or after the law's effective date." *McAndrews v. Fleet Bank,* 989 F.2d 13, 16 (1st Cir.1993); *see also FDIC v. Faulkner,* 991 F.2d 262 (5th Cir.1993), *reh'g denied,* June 30, 1993 WL. The ADA provided an 18 month notice period in which businesses could comply with the Act's requirements, and no liability was imposed prior to the end of that period. *See* 42 U.S.C. § 12181 note (Supp. II 1990). Small businesses were given an even lengthier notice period. *Id.* Pinnock's complaint was not filed until September 9, 1992, nearly two years after the ADA was passed on July 26, 1990. The requirements of the title III do not subject Zahedi to retroactive legislation.

## V. Promulgation by the Attorney General's Office of Regulations Implementing the Provisions of Title III of the ADA is not an Unconstitutional Delegation of Authority by Congress

■ Zahedi argues that ADA represents an unconstitutional delegation of legislative authority to the executive and judicial branches. Article I, section I, of the U.S. Constitution vests the legislative powers in Congress. Broad delegation of that power violates the Constitution's separation of powers between the branches of government. *See generally* **James Madison, The Federalist, No. 47, 244 (1788)** (Bantam Books 1982).

While the non-delegation doctrine is an important limitation upon congressional powers, it has rarely been invoked by the courts to invalidate legislation. The Supreme Court first applied the doctrine in two related cases

involving depression-era legislation: *A.L.A. Schechter Corp. v. United States,* 55 S.Ct. 837, 79 L.Ed. 1570, 295 U.S. 495 (1935) and *Panama Refining Co. v. Ryan,* 293 U.S. 388, 399, 55 S.Ct. 241, 79 L.Ed. 446 (1934). Since that time, however, the rule against delegation of legislative power has "yielded to the growing necessity for delegation to boards and officers of a large measure of discretionary power which is ordinarily considered legislative in character." **B.E. Witkin,** 7 Constitutional Law § 129 (9th ed. 1988). *See also* Harold I. Abramson, "A Fifth Branch of Government: The Private Regulators and Their Constitutionality," **16 Hastings Const. L.Q.** 165 (1989).

In *Touby v. United States,* the Court recently reiterated the standard governing delegation, holding that so long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power." 500 U.S. 160, 165, 111 S.Ct. 1752, 1756, 114 L.Ed.2d 219 (1991) (quoting *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928)). *See also American Power & Light Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946) (delegation is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority."). As illustrated below, title III meets the "intelligible principle test."

Zahedi claims that language in section 12186(b) of title III renders the ADA unconstitutional. This section states:

> Not later than 1 year after July 26, 1990, the Attorney General shall issue regulations in an accessible format to carry out the provisions of this subchapter not referred to in subsection (a) of this section that include standards applicable to facilities and vehicles covered under section 12182 of this title.

42 U.S.C. § 12186(b) (Supp. II 1990). In instructing the Attorney General to issue regulations, this section explicitly incorporates provisions set forth in the remainder of the title. As the Government points out, the substance of these provisions provide important guidelines for the requested regulations.

For example, the statute guides the Attorney General by 1) defining who is to be considered an individual with a disability under the Act,[10] 2) listing the categories of entities subject to title III as well as those that are exempt,[11] 3) specifying in detail the conduct that will violate the statute,[12] and 4) setting forth the means for enforcement including the types of relief to be afforded.[13] These guidelines provide a clear delineation of congressional policy, and easily satisfy the intelligible principle requirement.

Both *Schechter Corp.* and *Panama Refining Co.* are distinguishable from this case. Both these cases addressed the passage of a drastic depression-era act entitled the National Industrial Recovery Act of 1933 ("NIRA"). In *Panama Refining Co.,* the Court invalidated section 9(c) of NIRA which authorized the executive branch to prohibit the transportation of petroleum in interstate and foreign commerce. The statute failed to provide any guidelines or to articulate any policy regarding the circumstances or conditions under which the executive branch could exercise this prohibitive authority. The Court found that the bald delegation of power exceeded Congress's authority under Article I.

Similarly, in *Schechter Corp.,* the Court addressed section 3(a) of NIRA, which empowered the President to promulgate "codes of fair competition." This broad grant of power essentially transformed the executive branch into a legislative body, providing the President with no guidance as to the standards embodied in "fair competition" or even specifying which areas of trade were to be addressed. The Court found that such a broad delegation of unlimited discretion in pursuit of an objective as vague as "fair

---

**10.** *See* 42 U.S.C. § 12102(2) (Supp. II 1990).

**11.** *See* 42 U.S.C. §§ 12181(2), (7) & 12187 (Supp. II 1990).

**12.** *See* 42 U.S.C. § 12182 (Supp. II 1990).

**13.** *See* 42 U.S.C. § 12188 (Supp. II 1990).

competition" violated the division of powers embodied in the Constitution.

Zahedi argues that several of the cases cited by the Government do not apply in this instance because in those cases Congress set numerical limits for the delegated regulations. However, those cases all involved regulations which were by nature quantitative, and therefore can be distinguished from the ADA. For example, in *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), the Supreme Court upheld Congress' delegation of authority to establish sentencing guidelines under the Sentencing Reform Act ("SRA"). The SRA provided maximum sentencing guidelines for the commission. Sentencing guidelines are *necessarily* quantitative, however, while modifications to public accommodations to provide access for the disabled are not. In fact, as the Government argues, the adoption and imposition of inflexible quantitative guidelines under the ADA would inevitably lead to incongruous and unjust results. Rather, Congress instructed the executive branch to pass regulations achieving specified results, such as access to restrooms, and left the process of determining how best to reach these results to the Department of Justice.

Similarly, in *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), a case the Court relied on in *Mistretta*, the Court upheld the Emergency Price Control Act's delegation of authority to the Administrator to "promulgate regulations fixing prices of commodities which 'in his judgment will be generally fair and equitable and will effectuate the purposes of th[e] Act.'" *Yakus*, at 420, 64 S.Ct. at 665. The Court held that "[i]t is no objection [that such determinations] ... call for the exercise of judgment, and of the formulation of subsidiary administrative policy within the prescribed statutory framework." *Id.* at 425, 64 S.Ct. at 667.

Zahedi argues that *Yakus* is distinguishable because Congress set a specific maximum rate for the tariffs, implying that such quantitative directives are necessary to preserve the ADA from challenge. As in *Mistretta*, however, Congress was acting in an area that was purely quantitative. Guidelines of such a nature cannot be readily applied to regulations such as those required under the ADA.

Perhaps most significantly, this Court is bound by the recent holding by the Ninth Circuit in *Railway Labor Executives' Assn. v. Skinner*, 934 F.2d 1096, 1100 (9th Cir. 1991). There the appellate court ruled that the Secretary of. Transportation's promulgation of drug testing regulations did not result from an unconstitutional delegation of power when that rulemaking authority was derived only from a statutory directive to promulgate "appropriate rules regulations, orders and standards for all areas of railroad safety." Such rules are closely analogous to the regulations promulgated under the ADA. Both set forth clear objectives (railroad safety and access for the disabled) and request that the executive branch set guidelines fulfilling those rules. Such guidelines are necessarily detailed, and therefore appropriate for promulgation by an agency rather than Congress.[14] As the Supreme Court noted in *American Power & Light Company v. Securities & Exchange Comm'n*, "the judicial approval accorded ... 'broad' standards for administrative action is a reflection of the necessities of modern legislation dealing with complex economic and social problems ..." 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946).

## VI. Requiring Alterations to Property in Compliance with Title III of the ADA Is Not an Unconstitutional Taking Without Just Compensation

Zahedi contends that the expenditure of funds necessary to make the rest-

---

**14.** As the Government has argued, administrative rulemaking is particularly suitable for the complex task of gathering and analyzing the necessary facts to develop more specific rules. Prior to issuing the regulations implementing title III, the Department of Justice held four public hearings across the nation at which 329 persons testified. 56 Fed.Reg. 35,5444 (1991). In addition, the Department solicited comments through its rulemaking process, and received hundreds of comments containing over 10,000 pages of information. *Id.* The Department reviewed all of these comments and took them into account in formulating the final regulation. *Id.* at 35,545. The Supreme Court has recognized that it is exactly these types of "intricate, labor-intensive task[s]" that are particularly appropriate for delegation. *Mistretta,* 488 U.S. at 379, 109 S.Ct. at 658.

rooms in his facility accessible to individuals in wheelchairs, if required under the ADA, would constitute a taking of private property "for public use, without just compensation" in violation of the Fifth Amendment's Due Process Clause. In *Lucas v. South Carolina Costal Council*, —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the Supreme Court delineated three situations in which a governmental restraint is considered a taking, therefore requiring compensation. These three situations are: 1) When the regulation compels a permanent physical invasion of the property; 2) When the regulation denies an owner all economically beneficial or productive use of its land; 3) When the regulation in question does not substantially advance a legitimate governmental objective. If either of the first two situations occur, the regulation will be considered a taking regardless of whether the action achieves an important public benefit or has only minimal impact on the owner. *Lucas*, —— U.S. at ——, 112 S.Ct. at 2893. The expenditure of funds required by title III does not constitute a taking under the Fifth Amendment as defined in *Lucas*.

## A. Requiring Zahedi to Comply With the ADA Does Not Constitute a Physical Invasion His Property.

The Fifth Amendment provides that private property may not be taken for public use without just compensation. A cornerstone of the law of takings is that if a regulation has the effect of establishing a permanent physical occupation, it will be a taking. *Nollan v. California Coastal Commission*, 483 U.S. 825, 831, 107 S.Ct. 3141, 3145, 97 L.Ed.2d 677 (1987) (requiring the granting of an easement as a condition to rebuild a home is a taking). An invasion will constitute a taking even if the amount taken is insubstantial. *Loretto v. Teleprompter Manhattan CATV*, 458 U.S. 419, 430, 102 S.Ct. 3164, 3173, 73 L.Ed.2d 868 (1982). The *Loretto* Court noted that:

> [W]hen the "character of the governmental action" is a permanent physical occupation of the property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit, or

has only minimal economic impact on the owner.

*Id.* at 434–35, 102 S.Ct. at 3175. Therefore, when a law results in a permanent physical occupation of property, the government must compensate the landowner.

Zahedi argues that the remodeling required under the ADA may result in the loss of as many as 20 seating places in his restaurant. Zahedi cites *Loretto* in support of his argument that a regulation which requires a restaurant to widen restrooms and thereby restricts the use of part of his property, violates the Fifth Amendment. Zahedi, however, provides an inaccurate recitation of *Loretto*. The Supreme Court's analysis in *Loretto* rests on the finding that a regulation which gives an *outside entity* the right to physically intrude upon the property is actually the granting of an easement without compensation, which can constitute a taking. In *Loretto*, the Supreme Court found that a statute requiring a landlord to permit a cable television company to install cable television on his property constituted a taking. This case, however, does not involve the granting of Zahedi's property to another party for its own exclusive use and profit. Rather, the ADA merely proscribes Zahedi's use of part of his *own* property and it therefore could be likened to a zoning regulation. Since the ADA merely regulates the use of property and does not give anyone physical occupation of Zahedi's property, it is not within the Supreme Court's first category of takings.

## B. THE ADA Does not Deny Zahedi ALL Economically Beneficial or Productive Use of His Land.

Regulations which restrict the use of property will be upheld unless the economic impact of a challenged statute is so extreme that it denies the claimant any economically viable use of the property. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (the denial of a permit to fill in a wetland does not constitute a taking); *Lai v. City and County of Honolulu*, 841 F.2d 301, 303 (9th Cir.1988) (no taking found even when creation of scenic easement prevented construction of a highrise condominium). Perhaps the *Lucas*

Court provided the clearest justification for this rule when it stated:

> [the] total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation.

*Lucas,* —— U.S. at ——, 112 S.Ct at 2894. Zahedi does not, however, claim that the ADA would deny him all economic use of his property. To the contrary, Zahedi claims only that expenditures may be necessary to comply with the regulation.

Importantly, the ADA was specifically drafted to protect existing businesses from undue hardship. By adopting a "readily achievable" standard, Congress ensured that a business's obligation to remove barriers would reflect its ability to do so. As the Government states, barrier removal which would in fact have a dramatic deleterious effect on IHOP's business would not be required under the "readily achievable" standard. U.S. Mem. in Support of Cross Mot. for Sum. J. at 43.

The remodeling which Zahedi claims is required under the ADA regulations could result in the loss of approximately 20 seating places in his restaurant. The mere loss of approximately 20 seating places surely will not deny Zahedi all economically viable use of his property.

The Court must also consider whether the requirements of the statute frustrate the property owner's reasonable investment backed expectations. As discussed above, the ADA was specifically drafted to avoid the imposition of economic hardship upon the operators of public accommodations, particularly those running smaller operations. A showing of frustration of investment-backed expectation is a very difficult one to make, and the impact of the ADA's barrier removal requirements pales in comparison to many of the regulations which the Supreme Court has upheld. In *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Supreme Court held that federal laws which prohibited sale of articles made from feathers of protected birds did not violate Fifth Amendment, even where laws prohibited all of the uses originally intended for the products. The Court in *Andrus* noted:

> loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim ... [p]erhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as a less compelling than other property-related interests.

*Andrus,* 444 U.S. at 66, 100 S.Ct. at 327. Regulations have been upheld even where they resulted in a complete restriction upon a specific individual's future exploitation of the property for profit. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 485, 107 S.Ct. 1232, 1241, 94 L.Ed.2d 472 (1987) (restriction upon removal of coal did not completely destroy value of owner's economic interest in coal).

## C. The Statutory Requirements of Title III Substantially Advance a Legitimate Governmental Interest.

 A taking occurs when a court finds that there is no evidence that property restrictions will further the stated rationale of a statute. *Nollan,* 483 U.S. at 838, 107 S.Ct. at 3149. In *Nollan,* the Court found that by requiring an owner who wished to build beach front property to grant a public easement across the property, the California Coastal Commission had taken his property without just compensation. The Court used a means/ends analysis to determine if there was a close "fit" between the restriction and the interests aimed to be advanced. *Nollan,* 483 U.S. at 838, 107 S.Ct. at 3149. The Court decided that requiring the property owner to grant an easement failed the means/ends analysis because there was no relation between the statute and its stated aim, which was to alleviate the effect the homes would have on the view of the beach from the public thoroughfare. *See also Commercial Builders v. Sacramento,* 941 F.2d 872 (9th Cir.1991) (ordinance, requiring the payment of a fee before being granted a non-residential building permit was held not to be an unconstitutional taking because there was nexus between the regulation and the problem to be addressed).

In contrast, the barrier removal requirements of title III clearly forward the stated objectives of the ADA. The ADA aims:

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; [and]

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

42 U.S.C. § 12101(b)(1) & (2) (Supp. II 1990). The legislative history of the Act reflects congressional concern over the deleterious effects of discrimination against people with disabilities:

The large majority of people with disabilities do not go to movies, do not go to the theater, do not go to see musical performances, and do not go to sports events. A substantial minority of persons with disabilities never go to a restaurant, never go to a grocery store, and never go to a church or synagogue.... The extent of non-participation of individuals with disabilities in social and recreational activities [is] alarming.

Senate Report at 11 (citing the findings of a recent Lou Harris poll summarized by the National Council on Disability). Congress found that the exclusion of disabled individuals from public life was largely a result of the "lack of physical access to facilities." Senate Report at 11. As a result, the legislative body elected to adopt the barrier removal requirements embodied in title III. These requirements directly address and remedy the problems which the Act aims to redress.

## VII. Title III does not Intrude Upon State Sovereignty In Violation of the Tenth Amendment

■ Zahedi argues that the ADA constitutes a "national building code" which trespasses the regulatory area reserved to the states by the Tenth Amendment. It was once contended that the federal government had no police power, as such, except in the District of Columbia. It is now the law, however, that the federal government's implied powers under the "necessary and proper clause" of the Constitution (Art. I, § 8) provide for the passage of laws similar to legislation enacted by a state under its police power. Hence, it is recognized today that "in the exercise of its control over interstate commerce, the means employed by the Congress may have the quality of police regulations." *Kentucky Whip & Collar Co. v. Illinois Cent. R. Co.,* 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270 (1936). *See also* B.E. Witkin, 8 Constitutional Law § 788 (9th ed. 1988).

■ The Tenth Amendment does not insulate states from federal regulation simply because the regulation affects an area traditionally subject to state control. *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Rather, the Court has held that neither the Tenth Amendment nor the structure of the federal system justifies restriction of Congress's power to apply otherwise valid commercial regulation to state or local governments. In *Garcia,* the Supreme Court found

unsound in principle and unworkable in practice a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is "integral" or "traditional."

469 U.S. at 546–47, 105 S.Ct. at 1015. Instead, the Court emphasized that the Tenth Amendment's primary protection lies in its limitation on the federal legislative process, which protects the sovereignty of states by "the built-in restraints that our system provides through state participation in federal governmental action." *Id.* at 556, 105 S.Ct. at 1020.

Likewise, in *South Carolina v. Baker,* the Court ruled that Congress's removal of a federal tax exemption for interest earned on state and local government bonds did not violate the Tenth Amendment. 485 U.S. 505, 512, 108 S.Ct. 1355, 1360, 99 L.Ed.2d 592 (1988). Rejecting South Carolina's substantive analysis, the Court said, "States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable activity." *Id.* at 512, 108 S.Ct. at 1360.

The Tenth Amendment protects the states from federal laws which "commandee[r] the legislative processes of the states by directly compelling them to enact and enforce a fed-

**590**

eral regulatory program." *New York v. United States,* — U.S. —, —, 112 S.Ct. 2408, 2420, 120 L.Ed.2d 120 (1992) (citing *Hodel,* 452 U.S. at 288, 101 S.Ct. at 2366). In *New York,* the Supreme Court ruled that certain provisions of the Federal Low–Level Radioactive Waste Policy Act were unconstitutional because they required the states to choose between either "accepting ownership of [radioactive] waste or regulating according to the instruction of Congress." *New York,* — U.S. at —, 112 S.Ct. at 2428. The Court found that such a requirement presented "no choice at all." *Id.*

By contrast, title III's statutory scheme does not displace local building codes. It is a federal civil rights act that sets forth accessibility standards that places of public accommodation and commercial facilities must follow. Departures from the ADA Standards are expressly permitted where "alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility." 28 C.F.R. pt. 36, app. A, § 2.2, at 482 (1991). State and local building codes remain in effect to be enforced by state officials. State officials are not required to adopt or enforce the ADA Standards for Accessible Design.

**VIII. Conclusion**

The Court notes that many of Zahedi's arguments raise points which have been sympathetically received by organizations and individuals outside the judicial system. As Zahedi's brief illustrates, the public has grown increasingly weary of regulations which burden businesses and the court system with uncertain requirements. A district court, however, is limited to considering the constitutionality of the challenged regulations, rather than their political or economic desirability. Although members of the judiciary have occasionally taken forays into the political arena, I agree with Justice Frankfurter, who once noted: "The Framers carefully and with deliberate forethought refused to so enthrone the judiciary." *Baker v. Carr,* 369 U.S. 186, 270, 82 S.Ct. 691, 739, 7 L.Ed.2d 663 (1962) (dissenting opinion.)

Having carefully considered each of Zahedi's constitutional challenges, it is clear that none of these challenges can prevail.

The United States' cross-motion for summary judgment is granted. Zahedi's motion for summary judgment is denied, and Zahedi's counterclaim is dismissed.

IT IS SO ORDERED: