

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-31-1995

# Helen v DiDario

Precedential or Non-Precedential:

Docket 94-1243

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Helen v DiDario" (1995). *1995 Decisions.* Paper 27.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/27

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-1243



HELEN L., BEVERLY D., FLORENCE H.,
ILENE F., IDELL S., and AMERICAN DISABLED
FOR ATTENDANT PROGRAMS TODAY ("A.D.A.P.T.")

Idell S., Appellant

v.

ALBERT L. DiDARIO, individually and in his
official capacity as Superintendent of Norristown
State Hospital, and KAREN F. SNIDER, in her capacity
as Secretary, Pennsylvania Department of Public Welfare

Karen F. Snider, Appellee



Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 92-6054)



Argued September 13, 1994

Before: MANSMANN, COWEN and McKEE, <u>Circuit Judges</u>

Opinion Filed: January 31, 1995



ILENE SHANE, ESQ.
ROBIN RESNICK, ESQ.
Disabilities Law Project
801 Arch Street, Suite 610
Philadelphia, PA  19107

STEPHEN F. GOLD, ESQ. (Argued)
Suite 700
125 South 9th Street
Philadelphia, PA  19107

                    Attorneys for Appellant

          JOHN A. KANE, ESQ.
          HOWARD ULAN, ESQ. (Argued)
          Department of Public Welfare
          Office of Legal Counsel
          Room 305, Health & Welfare Building
          Harrisburg, PA  17120

                    Attorneys for Appellee

          DEVAL L. PATRICK, ESQ.
          DAVID K. FLYNN, ESQ.
          REBECCA K. TROTH, ESQ. (Argued)
          United States of America
          Department of Justice
          P.O. Box 66078
          Washington, D.C. 20035

                    Attorneys for the United States
                    as Amicus Curiae[1]

                    OPINION OF THE COURT

McKEE, Circuit Judge


     We are asked to decide if the Pennsylvania Department of

Public Welfare ("DPW")[2] is violating Title II of the Americans

with Disabilities Act (the "ADA" or the "Act"), 42 U.S.C. §

---

     1 The United States Department of Justice has filed an
Amicus Brief. 42 U.S.C. §12133 charges the Department with
enforcement of Title II of the ADA.  Pursuant to 42 U.S.C.
12134(a) and 42 U.S.C. 12206(c)(3), the Department has issued
regulations and a Technical Assistance Manual interpreting Title
II.   See 28 C.F.R. part 35 (1993); The Americans with
Disabilities Act Title II Technical Assistance Manual (1993).

     [2]Although Karen F. Snider is the named defendant in this
lawsuit, she was sued in her capacity as the Secretary of the
Pennsylvania Department of Public Welfare.  We will, therefore,
refer to the defendant as the Department of Public Welfare
("DPW"), rather than Snider.

12132, by the manner in which it operates its attendant care and nursing home programs. Idell S. alleges that DPW is violating the ADA by requiring that she receive required care services in the segregated setting of a nursing home rather than through DPW's attendant care program. That program would allow her to receive those services in her own home where she could reside with her children. The district court ruled that DPW is not violating the ADA because it is not discriminating against Idell S. For the reasons that follow we will reverse.

## I.

In January of 1994, Idell S. filed an uncontested motion to join a lawsuit which had previously been filed by Beverly D., and Ilene F., who were also nursing home residents.[3] The suit alleged

---

[3] Helen L., the original plaintiff in this law suit, was a patient at Norristown State Hospital when her suit was filed. She asserted a constitutional claim against Albert DiDario (the Superintendent of that facility) for alleged violations of her Fourteenth Amendment rights for failing to place her in an appropriate community setting and for unnecessarily maintaining her in Norristown State Hospital. Although she alleged a claim under the ADA, she has since been discharged from Norristown State Hospital and thereafter pursed only a claim for damages for the alleged violation of her constitutional rights. Memorandum Opinion, at 15-6.

In November of 1992, Beverly D. and Ilene F., joined Helen L.'s law suit and an Amended Complaint was filed asserting a claim on their behalf against Karen F. Snider, as the Secretary of the Pennsylvania Department of Public Welfare. In April of 1993, they filed a motion for a preliminary injunction on their ADA claim. After the parties agreed to a Stipulation of Facts, the motion for preliminary injunction was converted to one for

that DPW had violated Title II of the ADA by providing services in a nursing home rather than in the "most integrated setting appropriate" to the plaintiffs' needs, and sought declaratory and injunctive relief.

Thereafter, Beverly D. and Ilene F. filed for an uncontested voluntary dismissal of their claim because they had been discharged from the nursing home. At the same time, Idell S. moved for summary judgment based upon an Amended Stipulation of Facts. Prior to ruling on the joinder and voluntary dismissal motions, the district court issued a Memorandum and Order dated January 27, 1994, granting summary judgment against Beverly D. and Ilene F. and in favor of DPW. On February 2, 1994, the district court issued an Order dismissing Beverly D. and Eileen F. as plaintiffs and adding Idell S. as a plaintiff. The court also ruled that "[f]or the reasons stated in the Memorandum filed January 27, 1994, the motion for summary judgment of Idell S. is denied and judgment is entered in favor of defendants and against . . . Idell S. . . . ."

Idell S. then filed this appeal.[4]

---

summary judgment, and DPW filed a cross-motion for summary judgment.

[4] In the same Memorandum and Order which denied Idell S.'s motion for summary judgment, the district court denied a motion for summary judgment filed by DiDario and DiDario appealed. DiDario's appeal did not involve any questions of law or fact in common with Idell S.'s appeal. On May 13, 1994, we entered an Order dismissing DiDario's appeal for lack of appellate jurisdiction because the district court Order appealed from was not a final order.

## II.

Idell S. is 43 years old and the mother of two children ages 22 and 14.[5]  In 1973 she contracted meningitis which left her paralyzed from the waist down and greatly reduced her ability to care for herself.  As a result, she has been a patient at the Philadelphia Nursing Home since December 26, 1989.  Idell S. uses a wheelchair for locomotion and requires assistance with certain activities of daily living including bathing, laundry, shopping, getting in and out of bed, and house cleaning.  She is able to cook, dress herself (except for her shoes and socks), attend to her personal hygiene (using a transfer board to access the toilet) and to her grooming.  The parties agree that, although Idell S. is not capable of fully independent living, she is not so incapacitated that she needs the custodial care of a nursing home.

---

Following the issuance of the February 2, 1994 Order granting summary judgment in favor of Snider and against Idell S., the district court issued a Rule 54(b) Certification and Order on February 8, 1994, directing the Clerk to enter final judgment in favor of defendant Snider against Idell S.  Because Idell S.'s sole claim was disposed of, the certification creates a final judgment subject to appeal pursuant to 28 U.S.C. §1291.  See, Tilden Financial Corp. v. Palo Tire Service, 596 F.2d 604, 607 (3d Cir. 1979).

Plaintiffs Florence H. and ADAPT were not parties to the summary judgment motions in the district court.  ADAPT's motion for voluntary dismissal was granted by the district court on February 18, 1994.

[5]The essential facts surrounding this controversy are not in dispute.  They are contained in an Amended Stipulation of Facts submitted to the district court in January of 1994.

DPW operates two different programs that provide physically disabled persons with assistance in daily living.  DPW funds nursing home residence through the Medical Assistance program ("Medicaid"), and it operates an "attendant care program" under 62 Pa. Cons. Stat. Ann. §§ 3051-3055 (the "Care Act").  The attendant care program provides "[t]hose basic and ancillary services which enable an individual [with physical disabilities] to live in his[/her] home and community rather than in an institution and to carry out functions of daily living, self care and mobility." 62 Pa. Cons. Stat. Ann. §§ 3052, 3054.  DPW's average cost of caring for a person in a nursing home is $45,000 per year.  The Commonwealth pays 44% of this amount ($19,800) and the difference ($24,200) is paid by the federal government.  DPW's average cost of caring for a person in the attendant care program is $10,500 per year.  That amount is totally borne by the Commonwealth.

Homemaker Service of the Metropolitan Area, Inc. ("HSMA") contracts with DPW to operate an attendant care program.  "The [s]ervice [provided by HSMA] consists of those basic and ancillary services which enable eligible individuals to live in their own homes and communities rather than in institutions and to carry out functions of daily living, self-care and mobility." Amended Stipulation of Facts, ¶ 35.  The program thus allows eligible individuals: "1. [t]o live in the least restrictive environment as independently as possible; 2. [t]o remain in their

homes and to prevent their inappropriate institutionalization. . . ." Id. at ¶36.

In 1993, HSMA evaluated Idell S. and determined that she was eligible for attendant care services. However, because of a lack of funding, she was placed on a waiting list for that program and continues living in a nursing home, separated from her children. The parties agree that if Idell S. were enrolled in the attendant care program, nursing home care would be inappropriate.[6] Except for access to skilled nursing care which she neither needs nor wants, Idell S. receives the same kind of services in the nursing home that the attendant care program would provide. "DPW has not applied for reimbursement under the Medical Assistance statute for personal care/attendant care services in the community," Amended Stipulation of Facts ¶41, nor has it "requested Medical Assistance dollars be available for Attendant Care Services in the Community." Id. at ¶37. Consequently, the Commonwealth continues to spend approximately $45,000 a year to keep Idell S. confined in a nursing home rather then spend considerably less to provide her with appropriate care in her own home.

Because she is required to receive services in a nursing home, Idell S. has no contacts with non-disabled persons other

---

[6] The parties have stipulated that "[t]he setting for the provision of attendant care services appropriate to the needs of Idell S. is in the community." Amended Stipulation of Facts ¶29. The parties further agree that "[w]ith attendant care services in the community, nursing home care would not be appropriate for Idell S." Id., at ¶32.

than the staff of the nursing home and visits from her two children. Idell S. claims that this violates Title II of the ADA.

### III.

The standard of review applicable to a grant of summary judgment is plenary. Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1297 (3d Cir. 1993). "On review, the appellate court is required to apply the same test the district court should have utilized initially." Goodman v. Mead Johnson & Co., 535 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977). A motion for summary judgment shall be granted if the court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The district court's interpretation of a federal regulation is a question of law subject to plenary review. ADAPT v. Skinner, 881 F.2d 1184, 1191 n. 6 (3d Cir. 1989).

The district court ruled that Idell S. was

> [d]enied attendant care services because of a lack of funds. [The record] does not demonstrate that [she has] been denied funding for attendant care services because [she] is disabled. [Her] failure to show that [she] has been excluded from the attendant care services program on the basis of [her] disability is fatal to [her] claim.

Memorandum Opinion at 11. We disagree.

### A.

In order to appreciate the scope of the ADA and its attendant regulations, it is necessary to examine the circumstances leading to its enactment. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, was the first broad federal statute aimed at eradicating discrimination against individuals with disabilities.[7] "Section 504 of the Rehabilitation Act of 1973, [is] commonly known as the civil rights bill of the disabled." ADAPT v. Skinner, 881 F.2d at 1187.

Section 504 now reads in relevant part:

> No otherwise qualified individual with a disability...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794 (Supp. 1994).[8] Section 504's sponsors described it as a response to "'previous societal neglect'" and introduced

---

[7] The law developed under section 504 of the Rehabilitation Act is applicable to Title II of the ADA. See, Easley v. Snider, 36 F.3d 297 (3d. Cir. 1994). See also, 28 C.F.R. § 35.103 ("[T]his part [applying to the ADA] shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 791)").

[8] The general prohibition against disability-based discrimination contained in §504 was first proposed in the 92nd Congress as an amendment to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. Although it was ultimately enacted by the 93rd Congress as part of a pending Vocational Rehabilitation Act, its language was patterned after other civil rights statutes. Alexander v. Choate, 469 U.S. 287, 296 n. 13 (1985). The language of section 504 is virtually identical to that of section 601 of Title VI of the Civil Rights Act of 1964 that bars discrimination based upon race, color or national origin in federally-assisted programs. Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 626 (1984).

it to  rectify "the country's 'shameful oversights' which caused the handicapped to live among society 'shunted aside, hidden and ignored.'" Alexander v. Choate, 469 U.S. 287, 296 (1985).

On April 26, 1976 then-President Gerald Ford signed Executive Order No. 11914, 3 C.F.R. 117 (1977), which authorized the Department of Health, Education and Welfare to coordinate enforcement of section 504 and which required the Secretary of HEW to promulgate regulations for enforcement.[9]  Subsequently, HEW's section 504 rulemaking and enforcement authority was transferred to the Department of Health and Human Services ("HHS").  See 20 U.S.C. § 3508.

On November 2, 1980, President Carter signed Executive Order No. 12250, 45 Fed. Reg. 72995, entitled "Leadership and Coordination of Nondiscrimination Laws".  That Executive Order transferred HHS's coordination and enforcement authority to the Attorney General.  Section 1-105 of that Executive Order provided

---

As originally enacted, section 504 referred to a "handicapped" individual being discriminated against solely by reason of a "handicap".  The change in nomenclature from "handicap" to "disability" reflects Congress' awareness that individuals with disabilities find the term "handicapped" objectionable.  Burgdorf, The Americans with Disabilities Act: Analysis and Implication of a Second-Generation Civil Rights Statute, 26 Harv. C.R. - C.L. L.Rev. 413, 522 n. 7 (1991).

[9] The Rehabilitation Act did not mandate that any regulations be promulgated. Accordingly the Department of Health, Education and Welfare (now the Department of Health and Human Services), did not promulgate any regulations to implement that Act. Southeastern Community College v. Davis, 442 U.S. 397, 404 n. 4 (1979).

that the HHS guidelines "shall be deemed to have been issued by the Attorney General pursuant to this Order and shall continue in effect until revoked or modified by the Attorney General." Thereafter, the Department of Justice adopted the HHS coordination and enforcement regulations and transferred them from 45 C.F.R. part 84 to 28 C.F.R. part 41, 46 Fed. Reg. 40686. (the "coordination regulations.")  The section 504 coordination regulations begin by stating that the purpose of 28 C.F.R. part 41 is to "implement Executive Order 12250, which requires the Department of Justice to coordinate the implementation of section 504 of the Rehabilitation Act of 1973." 28 C.F.R. § 41.1.  A subsequent section requires all federal agencies to issue regulations "to implement section 504 with respect to programs and activities to which it provides assistance."  28 C.F.R. § 41.4.  The coordination regulations contain a separate section which lists a number of general prohibitions against disability-based discrimination.  28 C.F.R. § 41.51.  That section mandates that all recipients of federal financial assistance "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons."  28 C.F.R. § 41.51(d).

Although Section 504 has been called "the cornerstone of the civil rights movement of the mobility-impaired", ADAPT v. Skinner, 881 F.2d at 1205 (3d Cir. 1989) (concurring opinion), its shortcomings and deficiencies quickly became apparent.  See,

e.g., Cook, The Americans with Disabilities Act: The Move to Integration, 64 Temp. L. Rev. 393, 394-408 (1991) (The Rehabilitation Act and its regulations have been practically a dead letter as a remedy for segregated public services). One commentator has written that the weaknesses of section 504 arise from its statutory language,[10] the limited extent of its coverage, inadequate enforcement mechanisms and erratic judicial interpretations. Burgdorf, The Americans with Disabilities Act: Analysis and Implications of a Second-Generation Civil Rights Statute, 26 Harv. C.R. – C.L. L. Rev. 413, 431 (1991).

Toward the end of the 1980's the United States Senate and the House of Representatives both recognized that then current laws were "inadequate" to combat "the pervasive problems of discrimination that people with disabilities are facing." S. Rep. No. 116, 101st Cong., 1st Sess. 18 (1989); H.R. Rep. No. 485 (II), 101st Cong., 2d Sess. 47 (1990). The Senate recognized the need for "omnibus civil rights legislation" for the disabled. S. Rep. No. 116, 101st Cong., 1st Sess. 19 (1989). Similarly, the House addressed the need for legislation that "will finally set in place the necessary civil rights protections for people with disabilities." H. R. Rep. No. 485 (II), 101st Cong., 2d Sess. 40 (1990). Both branches of Congress concluded:

> [T]here is a compelling need to provide a
> clear and comprehensive national mandate for

---

[10] We have also noted that section 504 "is both ambiguous and lacking in specifics." Disabled in Action of Pennsylvania v.Sykes, 833 F.2d 1113, 1117 (3d Cir. 1987), *cert. denied*, ___ U.S. ___, 108 S.Ct. 1293 (1988).

the elimination of discrimination against individuals with disabilities <u>and for the integration of persons with disabilities into the economic and social mainstream</u> of American life.  Further, there is a need to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities.

S. Rep. No. 116, 20; H. R. Rep. No. 485 (II), 50 (emphasis added).  It was against this backdrop that the ADA was enacted.[11]

**B.**

Title II of the ADA, 42 U.S.C. §§ 12131–12134, incorporates the "non-discrimination principles" of section 504 of the Rehabilitation Act[12] and extends them to state and local governments.  <u>Easley v. Snider</u>, 36 F.3d 297, 300 (3d Cir. 1994).

Section 202 of Title II provides:
[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The Act directs the Attorney General to promulgate regulations necessary to implement Title II.  <u>See</u> 42 U.S.C. § 12134(a).  The Act further commands that those regulations "be consistent with this chapter and with the coordination regulations under part 41 of title 28, Code of

---

[11] For a concise history of the ADA's "tortuous legislative journey", see Jones, <u>Overview and Essential Requirements of the Americans with Disabilities Act</u>, 64 Temp. L. Rev. 471, 472–475 (1991).

[12] <u>See</u> 28 C.F.R. § 28.103.

Federal Regulations . . . applicable . . . [under §504 of the Rehabilitation Act of 1973]." 42 U.S.C. § 12134(b).  Accordingly, the regulations that the Department of Justice promulgated under Title II are patterned after the section 504 coordination regulations.

Because Title II was enacted with broad language and directed the Department of Justice to promulgate regulations as set forth above, the regulations which the Department promulgated are entitled to substantial deference.  Blum v. Bacon, 457 U.S. 132, 141 (1982).  ("[T]he interpretation of [the] agency charged with the administration of [this] statute is entitled to substantial deference.")  "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."  Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984).  Unless the regulations are "arbitrary, capricious or manifestly contrary to the statute", the agency's regulations are "given controlling weight".  Chevron, U.S.A., Inc., 467 U.S. at 844.

Moreover, because Congress mandated that the ADA regulations be patterned after the section 504 coordination regulations, the former regulations have the force of law.  When Congress re-enacts a statute and voices its approval of an administrative interpretation of that statute, that interpretation acquires the force of law and courts are bound by the regulation.  United

States v. Board of Comm'rs of Sheffield, Alabama, 435 U.S. 110, 134 (1978).  The same is true when Congress agrees with an administrative interpretation of a statute which Congress is re-enacting.  See Don E. Williams Co. v. Commissioner, 429 U.S. 569, 574-577 (1977).  Although Title II of the ADA is not a re-enactment of section 504, it does extend section 504's anti-discrimination principles to public entities.  Furthermore, the legislative history of the ADA shows that Congress agreed with the coordination regulations promulgated under section 504.  See, e.g., S. Rep. No. 116, 101st Cong., 1st Sess. 44 (1989) ("The first purpose of [Title II] is to make applicable the prohibition against discrimination on the basis of disability, currently set out in regulations implementing section 504 of the Rehabilitation Act of 1973, to. . . state and local governments. . . . ");  H.R. Rep. No. 485 (III), 101st Cong., 2d. Sess. 50.  ("The general prohibitions set forth in the section 504 regulations are applicable to all programs and activities in Title II").

Idell S.'s challenge to DPW's treatment of her is based upon 28 C.F.R. § 35.130(d).  That ADA regulation states that: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  This regulation is almost identical to the section 504 integration regulation which has been in effect since 1981.  See 28 C.F.R. § 41.51(d)

(1981).[13]  As Congress has voiced its approval of that
coordination regulation, 28 C.F.R. § 130.35(d) has the force of
law.

## C.


In enacting the ADA, Congress found that "[h]istorically,
society has tended to isolate and segregate individuals with
disabilities, and...such forms of discrimination...continue to be
a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2)
(emphasis added).  Congress also concluded that "[i]ndividuals
with disabilities continually encounter various forms of
discrimination, including. . . segregation. . . .", 42 U.S.C.
§12101(a)(5) (emphasis added).  The House Report on the ADA noted
that: "Unlike the other titles in this Act, title II does not
list all of the forms of discrimination that the title is
intended to prohibit.  Therefore, the purpose of [section 204] is
to direct the Attorney General to issue regulations setting forth
the forms of discrimination prohibited."  H.R. Rep. No. 485
(III), 101st Cong., 2d Sess., 52 (1990) (emphasis added).

In furtherance of the objective of eliminating
discrimination against the disabled, Congress stated that "the
Nation's proper goals regarding individuals with disabilities are

---

[13] The section 504 integration regulation had been in effect
for 8 years when, in 1989,  the 101st Congress began holding
hearings on the proposed ADA.

to assure equality of opportunity, <u>full participation</u>, <u>independent living</u>, and economic self-sufficiency for such individuals[.]" 42 U.S.C. §12101(a)(8) (emphasis added). Similarly, in response to its mandate, the Department of Justice stated "[i]ntegration is fundamental to the purposes of the Americans with Disabilities Act." 28 C.F.R. Part 35, App. A. § 35.130.[14]  Accordingly, the integration mandate of § 35.130(d) is contained under 28 C.F.R. § 35.130 which is entitled "[g]eneral prohibitions against <u>discrimination</u>."

Thus, the ADA and its attendant regulations clearly define unnecessary segregation as a form of illegal discrimination against the disabled.[15] Accordingly, the district court erred in holding that the applicable provisions of the ADA "may not be

---

[14]We note that this is consistent with the Fair Housing Act of 1988, 52 U.S.C. §3604(f), another predecessor of the ADA.  In enacting that act, the House Judiciary Committee stated "[t]he Fair Housing Amendments Act, like Section 504 of the Rehabilitation Act of 1973, as amended, is a clear pronouncement of a national commitment to <u>end the unnecessary exclusion of persons with handicaps</u> from the American mainstream." H. Rep. No. 711, 100th Cong., 2d Sess., 18 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 2173, 2179 (emphasis added; footnote omitted).

[15]Even if it could be argued that the Act and its regulations are ambiguous on this point, the heading of the regulation at issue here, and the legislative history of the ADA confirm that Congress intended to define unnecessary segregation of the disabled as a form of illegal discrimination.  <u>See</u> <u>Crandon v. United States</u>, 494 U.S. 152, 158 (1990) (Where there is ambiguity "[i]n determining the meaning of [a] statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."); <u>See also</u> <u>INS v. Center for Immigrants' Rights</u>, _____ U.S. _____. 112 S. Ct. 551, 556 (1991) (the title of a regulation or section is relevant to its interpretation).

invoked unless there is first a finding of discrimination."
Memorandum Opinion at 12.

**D.**

In reaching its conclusion, the district court relied in large part upon Williams v. Secretary of the Executive Office of Human Services, 609 N.E.2d 447 (Ma. 1993).[16] In Williams, the Massachusetts Supreme Court held, inter alia, that the ADA does not require a specific proportion of that state's mental health service placements to be in integrated housing. The court stated:

> The focus of Federal disability discrimination statutes is to address discrimination in relation to nondisabled persons, rather than to eliminate all differences in levels or proportions of resources allocated and services provided to individuals with differing types of disabilities. In other words, the purpose of the ADA is to provide an equal opportunity for disabled citizens.

Williams, 609 N.E.2d at 559. (citations omitted).

We are not persuaded by the analysis in Williams. That court based its decision in part upon our own decision in Clark v. Cohen 794 F.2d 79 (3rd Cir. 1986), cert denied, 479 U.S. 962

---

[16] The district court also cited Pinnock v. International House of Pancakes, 844 F.Supp. 574, 582–3 (S.D. Ca. 1993), to support its ruling that 28 C.F.R. § 130(d) is not applicable unless there is a specific finding of discrimination. Id. at 12. However, Pinnock concerned an action under Title III of the ADA (public accommodations) and the discussion cited in the district court's opinion dealt with the Title III integration regulation which the Pinnock court held is "intended to prevent segregation based on fears and stereotypes about persons with disabilities." Id. Idell S.'s suit does not implicate Title III.

(1986) and the Supreme Court's decision in <u>Alexander v. Choate</u>, <u>supra</u>. Our holding in <u>Clark</u> is not based upon the ADA nor section 504, but upon the Due Process Clause of the Fourteenth Amendment. There, a forty-five year old, mentally retarded woman had been committed to a state-run mental institution since she was fifteen years old. She filed a complaint against the Commonwealth of Pennsylvania and the County of Philadelphia alleging various Constitutional violations as well as a violation of section 504 of the Rehabilitation Act. She alleged that her confinement was illegal and sought placement in a community-living arrangement supervised by the County of Philadelphia. Clark based her Rehabilitation Act claim upon the fact that the Commonwealth was providing community living arrangements to persons with disabilities similar to hers while requiring her to remain in an institution.

The district court ruled that Clark had not established disability-based discrimination, but ruled that her confinement was unconstitutional.[17] 619 F. Supp. at 696-705. In affirming the district court's judgment we stated "[s]ection 504 prohibits discrimination against the handicapped in federally funded programs[,] [i]t imposes no affirmative obligations on the states to furnish services." <u>Clark v. Cohen</u>, 794 F. 2d at 85, n.3. However, we were not there concerned with the integration mandate

---

[17] Clark had been continuously confined even though the responsible professionals at the institution admitted that her condition did not warrant confinement, and her case had never been reviewed by anyone with authority to release her.

of the ADA or the Rehabilitation Act.  Plaintiff in <u>Clark</u> relied primarily upon section 504 and 45 C.F.R. §§ 84.4(b)(1)(i)-(iv). The prohibitions contained in the later regulations are under a regulation which states "Discriminatory actions prohibited." 45 U.S.C. § 84.4(b).  That regulation does not state that the actions set forth are prohibited per se.  Rather, it states that recipients of federal funds may not engage in the enumerated acts "on the basis of handicap."  45 U.S.C §84.4(b)(1).  Thus, the section 504 inquiry in <u>Clark</u> had to include a determination of the basis for the allegedly discriminatory actions.  The language of 28 C.F.R. § 35.130(d) is very different.

In addition, we note that the court in <u>Williams</u> was troubled by difficulties of proof that are not present here.  The plaintiffs in <u>Williams</u> had attempted to use a statistical analysis to establish that disabled persons were more likely to be adversely affected by the state's policy than non-disabled persons.  The court rejected that proof stating:

> The plaintiffs' use of a system-wide percentage of DMH clients . . . ignores the fact that the ADA does not mandate particular system-wide percentages for allocations of community placements.  Further, the plaintiffs' figures did not show that any particular client's placement was inappropriate, or that they themselves were inappropriately placed in a segregated setting. . . A mere percentage, standing alone, does not establish a presumption of inappropriate placement.

<u>Id</u>., at 414 Mass. 551, 557-8, 609 N.E.2d. 447, 453.  We encounter no such problem as the parties have stipulated that Idell S.'s placement would be inappropriate if there was an opening in the attendant care program.[18]

The court in <u>Williams</u> was also troubled by pragmatic concerns of granting relief.  The court stated that "any interpretation of the ADA must consider the same practicalities that the United States Supreme Court acknowledged in its examination of the Federal Rehabilitation Act.  <u>See</u>, <u>e.g</u>. <u>Alexander v. Choate</u>, . . . ".  <u>Id</u>. at 557, 453 (citations omitted).  <u>Choate</u> did not involve 28 C.F.R. § 35.130(d).  The claim there was based upon plaintiffs' assertion that Tennessee's planned cutbacks in Medicaid reimbursement for in-patient hospital stays would disproportionately disadvantage handicapped persons in violation of section 504.  However, to the extent that <u>Choate</u> is relevant to our analysis, it supports our holding that Congress did not intend to condition the protection of the ADA upon a finding of "discrimination".

In <u>Choate</u>, the Supreme Court emphasized the factors which led to enactment of section 504.

> Discrimination against the handicapped was perceived by Congress to be most often the product, <u>not of invidious animus, but rather of thoughtfulness and indifference</u> -- of

---

[18] The precise question raised by Idell S. has not previously been decided by an appellate court.  Similarly, the cases from other circuits that DPW relies upon to support its assertion that neither §504 nor Title II of the ADA require community care were not decided on the basis of 28 C.F.R. § 35.130(d).  Brief of Appellee, at 10-11.

> benign neglect. Thus, Representative Vanik,
> introducing the predecessor to § 504 in the
> House described the treatment of the
> handicapped as one of the country's 'shameful
> oversights' which caused the handicapped to
> live among society 'shunted aside, hidden,
> and ignored.' Similarly, Senator Humphrey . .
> . asserted that, 'we can no longer tolerate
> the invisibility of the handicapped in
> America. . . .' And Senator Cranston . . .
> described the Act as a response to 'previous
> societal neglect' . . . . Federal agencies and
> commentators on the plight of the handicapped
> similarly have found that discrimination
> against the handicapped is primarily the
> result of apathetic attitudes rather than
> affirmative animus.

469 U.S. at 295 (emphasis added) (citations and footnotes
omitted).[19]

Because the ADA evolved from an attempt to remedy the
effects of "benign neglect" resulting from the "invisibility" of
the disabled, Congress could not have intended to limit the Act's
protections and prohibitions to circumstances involving
deliberate discrimination. Such discrimination arises from
"affirmative animus" which was not the focus of the ADA or
section 504.  The Supreme court elaborates upon this distinction
noting that, although discrimination against the disabled
normally results from "thoughtfulness" and "indifference", not
"invidious animus", such "animus" did exist.  469 U.S. at 295 at
n.12.  ("To be sure, well-cataloged instances of invidious

---

[19] The court ruled that the challenged cutbacks were neutral
on their face and that, therefore, plaintiffs could not recover.
However, the court noted that a plaintiff need not establish that
there has been an intent to discriminate in order to prevail
under section 504. 469 U.S. at 295-297.

discrimination against the handicapped do exist").  However, that was not the focus of section 504, or the ADA.  Rather, the ADA attempts to eliminate the effects of that "benign neglect," "apathy," and "indifference."  The 504 coordination regulations, and the ADA "make clear that the unnecessary segregation of individuals with disabilities in the provision of public services is itself a form of discrimination within the meaning of those statutes, independent of the discrimination that arises when individuals with disabilities receive different services than those provided to individuals without disabilities."  Brief of Amicus at 7.

The ADA is intended to insure that qualified individuals receive services in a manner consistent with basic human dignity rather than a manner which shunts them aside, hides, and ignores them.[20]  "[M]uch of the conduct that Congress sought to alter in passing the Rehabilitation Act [and the ADA] would be difficult if not impossible to reach were the Act[s] construed to proscribe only conduct fueled by a discriminatory intent."  Alexander v. Choate, 469 U.S. at 296-7.  Thus, we will not eviscerate the ADA by conditioning its protections upon a finding of intentional or overt "discrimination."

---

[20]However, as discussed infra, the Act does not require fundamental changes in the nature of a service or program.

**IV.**

DPW quotes <u>Traynor v. Turnage</u>, 485 U.S. 535, 548 (1988) to argue that there can be no improper discrimination here because the services at issue are only provided to persons with disabilities.  <u>See</u> Brief of Appellee at 25-6.  However, <u>Traynor</u> is easily distinguished.  <u>Traynor</u> concerned the legality of 38 U.S.C.A. § 1662 which allowed for an extension of time to use veteran's benefits if a disability precluded the veteran from using the benefits within the time frame established by law.  However, the veteran only qualified if he/she could establish "a physical or mental disorder which was not the result of [his/her] own willful misconduct."  <u>Id</u>. at 535.  Traynor was an honorably discharged veteran who suffered from alcoholism unrelated to any psychiatric disorder. Under applicable V.A. regulations, such alcoholism  was defined as "willful misconduct" thus precluding him from relying upon his "disorder" to enlarge the period of time that he could use his benefits.  Traynor challenged this limitation on behalf of himself, and other similarly situated veterans.

In denying the claim, the court noted that section 504 had been part of the amendments to the Rehabilitation Act which were passed in 1978 and which extended the scope of that legislation to "any program or activity conducted by any Executive Agency." <u>Id</u>. at 547.  The court noted that

> petitioners can prevail under the Rehab-
> ilitation Act claim only if the 1978
> legislation can be deemed to have implicitly

> repeated the willful misconduct provision of
> the 1977 legislation or forbade the Veterans'
> Administration to classify primary alcoholism
> as willful misconduct. They must thereby
> overcome the cardinal rule. . . that repeals
> by implication are not favored.

Id. (citations and internal quotes omitted). The court reasoned that it was not at liberty to assume that the subsequent enactment of the Rehabilitation Act implicitly repealed the prior act unless "such a construction is absolutely necessary . . . in order that [the] words [of the latter statute] shall have any meaning at all." Id. (brackets in original). These two enactments were "capable of co-existence" as the "willful misconduct" provision did not undermine the central purpose of section 504. That purpose was to "assure that handicapped individuals receive 'evenhanded treatment' in relation to nonhandicapped individuals." Id. at 548 (citing Alexander v. Choate).

The court then noted that the program at issue did not treat handicapped persons less favorably than nonhandicapped persons as only handicapped persons could apply for an extension of time. "In other words § 1662(a)(1) merely provides a special benefit to disabled veterans who bear no responsibility for their disabilities that is not provided to other disabled veterans or to any able-bodied veterans." Id. The court then stated "[t]here is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons." Id.

However, the court was not concerned with the application of the integration mandate, or anything analogous to it, and the holding is not germane to our analysis. As noted above, Congress has stated that "discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization." 42 U.S.C. §12101 (3). If Congress were only concerned about disparate treatment of the disabled as compared to their nondisabled counterparts, this statement would be a non sequitur as only disabled persons are institutionalized.

DPW also relies upon Johnson v. Thompson, 971 F.2d 1487, 1494 (10th Cir. 1992), cert. denied, 113 S.Ct. 1255 (1993). ("[W]here the handicapping condition is related to the condition(s) being treated, it will rarely, if ever, be possible to say. . . that a particular decision was 'discriminatory'") (citation omitted)). See Brief of Appellee at 7. Johnson is also inapposite. There, the court was asked to hold that different levels of medical treatment given to differently classified infants affected with spina bifida violated section 504. The case did not involve any claim that the integration mandate of 504 or the ADA had been violated.[21]

DPW also attempts to defeat Idell S.'s claim by labelling it a claim for "community care" or "deinstitutionalization" --

---

[21] See Martin v. Voinovich, 840 F. Supp. 1175, 1191–92 (S.D. Ohio 1993) (Under §504 and the ADA, discrimination between people with different disabilities may be actionable).

something which the ADA does not require.[22] <u>See</u> Brief of Appellee at 10. Idell S. is not asserting a right to community care or deinstitutionalization per se. She properly concedes that DPW is under no obligation to provide her with any care at all. She is merely claiming that, since she qualifies for DPW's attendant care program, DPW's failure to provide those services in the "most integrated setting appropriate" to her needs (without a proper justification) violates the ADA.

**V.**

DPW's obligation to provide appropriately integrated services is not absolute as the ADA does not require that DPW make fundamental alterations in its program.

> A public entity shall make reasonable
> modifications in policies, practices, or
> procedures when the modifications are
> necessary to avoid discrimination on the
> basis of disability, unless the public entity
> can demonstrate that making the modifications
> would fundamentally alter the nature of the
> service, program, or activity

28 C.F.R. § 35.130(b)(7). In <u>Southeastern Community College v. Davis</u>, 442 U.S. 397 (1979), and <u>Alexander v. Choate</u>, <u>supra</u>, the Supreme Court attempted to define the limits of the requirements under the ADA.

In <u>Southeastern</u>, Southeastern Community College refused to admit an applicant to its nursing school program because of her

---

[22] <u>See</u> <u>Pennhurst State School and Hospital v. Halderman</u>, 451 U.S. 1, 24 (1981) (deinstitutionalization involves "massive" changes in a state's programs and is not required absent a clear statutory command).

hearing impairment. The college argued that a registered nurse had to meet certain physical requirements, and asserted that Davis' disability compromised her ability to effectively participate in critical training programs and safely care for patients. Davis countered that section 504 required that the school take certain measures to allow her to enjoy the benefits of the nursing program. The Court disagreed and held that section 504 imposes no obligation to engage in "affirmative action." Id. at 411. In Choate, the Court explained that "affirmative action" as used in Davis "[r]eferred to those 'changes,' 'adjustments,' or 'modifications' to existing programs that would be 'substantial' or that would constitute 'fundamental alteration[s]' in the nature of a program . . .,' rather than to those changes that would be reasonable accommodations." (citations omitted). Id. at 300 n. 20.

> In attempting to discern what is required by the language of section 504, we must view it in light of two countervailing legislative concerns: (1) effectuation of the statute's objectives of assisting the handicapped; and (2) the need to impose reasonable boundaries in accomplishing this legislative purpose. See Alexander v. Choate.

ADAPT v. Skinner, 881 F.2d at 1191. "The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program." Easely v. Snider, 36 F.3d at 305.

Here, DPW agrees that "the most integrated setting appropriate to [Idell S.]" is her home but argues that it cannot comply with Idell S.'s request for the "most integrated services appropriate" absent a fundamental alteration of its program. Brief of Appellee, at 13-17. The only explanation DPW has offered for this position is its assertion that funding for nursing home and attendant care for fiscal year 1993-1994 has already been appropriated by the General Assembly of Pennsylvania and that it cannot, under state constitutional law, shift funds from the nursing care appropriation to attendant care. Brief of Appellee, at 14-15. However, Idell S. is not asking that DPW alter its requirements for admission to the program, nor is she requesting that the substance of the program be altered to accommodate her.[23] Even if we assume that DPW cannot (or will not) cause the necessary shift of funds under its current procedures and practices, it is clear from this record that providing attendant care services to Idell S. in her home would not be a fundamental alteration of the attendant care program or the nursing home program.

As previously noted, DPW administers its attendant care program under the Care Act, 62 Pa. Stat. Ann. § 3052 et seq. (1994). That Act states:

---

[23] See Easley v. Snider, supra (The ADA does not require that the Commonwealth extend its attendant care services to physically disabled individuals who were not mentally alert as doing so would result in an unreasonable modification of the program).

> The General Assembly declares it is the
> policy of this Commonwealth that:
>
>     (1) The increased availability of
> attendant care services for adults will
> enable them to live in their own homes and
> communities.
>     (2) Priority recipients of attendant care
> services under this act shall be those
> mentally alert but severely physically
> disabled who are in the greatest risk of
> being in an institutional setting.

> We have previously noted that the attendant care program
> enables physically disabled persons to
> "better control their lives and reach maximum
> independence when they are able to direct
> their own personal care and manage their
> home, business, and social lives.  Attendant
> [c]are in Pennsylvania continues to be seen
> as part of the wider independent living
> movement whose fundamental goals are to
> enable the physically disabled to: a)
> maintain a less restrictive and/or
> independent living arrangement; b) maintain
> employment; and/or c) remain in their homes."

Easley, 36 F.3d at 304.  This is remarkably similar to the policy
and purpose of the ADA in general, and 28 C.F.R. § 35.130(d) in
particular.  We fail to see how compliance with 28 C.F.R. §
35.130(d) requires DPW to fundamentally alter its attendant care
program.  Nor do we perceive how the requested moderation would
place an undue burden on DPW.  On the contrary, the relief that
Idell S. is requesting merely requires DPW to fulfill its own
obligations under state law.  This is not "unreasonable."

> As with Section 504 of the Rehabilitation
> Act, integrated services are essential to
> accomplishing the purposes of title II [of
> the ADA].  As stated by Judge Mansmann in
> Adapt v. Skinner, the goal [is to] eradicate

the 'invisibility of the handicapped'" . . . [s]eparate-but-equal services do not accomplish this central goal and should be rejected.

   The fact that it is more convenient, either administratively or fiscally, to provide services in a segregated manner, does not constitute a valid justification for separate or different services under Section 504 of the Rehabilitation Act, or under [title II of the ADA].

H. R. Rep. 485 (III), 101st Cong. 2d Sess. 50. reprinted in 1990 U.S.C.C.A.N. at 73, (emphasis added).

Ironically, DPW asserts a justification of administrative convenience to resist an accommodation which would save an average of $34,500 per year, would allow Idell S. to live at home with her children, and which would not require a single substantive change in its attendant care or nursing home programs. DPW's resistance to such an accommodation is totally inconsistent with Congress' pronouncement that "[t]he Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, [and] independent living. . . ." 42 U.S.C. § 12101(a)(8).

DPW asserts that it cannot change Idell S.'s care because the nursing home and attendant care programs are currently funded on two separate lines of its budget.[24] The General Appropriations Act. Act 1-A of 1993, at 104, 115. DPW asserts that "[u]nder state constitutional law, Secretary Snider cannot

---

[24]This, of course, does not explain why DPW has not changed her status in a new budget year.

move funds from one line to another." See Brief of Appellee at 14-15 (citing Ashbourne School v. Commonwealth, Department of Education, 43 Pa. Com. 593, 403 A.2d 161 (1979). It is not now up to us to invent a funding mechanism whereby the Commonwealth can properly finance its nursing home and attendant care programs. However, the ADA applies to the General Assembly of Pennsylvania, and not just to DPW. DPW can not rely upon a funding mechanism of the General Assembly to justify administering its attendant care program in a manner that discriminates and then argue that it can not comply with the ADA without fundamentally altering its program. We dismissed a similar contention in Delaware Valley Citizen's Council for Clean Air v. Commonwealth of Pennsylvania, 678 F.2d 470 (3rd Cir. 1982). There, plaintiff sought to hold certain members of the executive branch of state government in contempt for failing to comply with a consent decree in which the officials had agreed to establish an admissions inspection program. After the consent decree had been executed, the General Assembly enacted legislation which specifically "prohibited the expenditure of state funds by the executive branch for the implementation of [that program]. Although the Governor vetoed the bill, the legislature overrode the veto and enacted [the legislation] into law." Id. at 473-4. Thereafter, the Department of Transportation "ceased all efforts toward implementing the [program]." Id. There, as here, the defendants relied upon Ashbourne, to argue

that their hands were tied by the power of appropriations vested

in the General Assembly.  We rejected that position.  "These

arguments disregard the fact that the Commonwealth itself was and

remains bound by the consent decree."  Delaware Valley Citizen's

Council, 678 F.2d at 475.  We stated:

> Because the Commonwealth, including all its
> branches, is bound by the decree, the
> argument of inability to comply rings hollow.
> Even if the executive branch defendants were
> physically or legally incapable of complying
> with the decree, those Commonwealth officials
> sitting in the General Assembly certainly are
> not incapable of insuring the Commonwealth's
> compliance.

678 F.2d at 476-6.  The same applies here:  since the

Commonwealth has chosen to provide services to Idell S. under the

ADA, it must do so in a manner which comports with the

requirements of that statute.


**VI.**

Generally, an appellate court reversing a grant of summary

judgment will not direct the district court to enter summary

judgment in favor of appellant because a genuine issue of

material fact will remain.  First National Bank v. Lincoln

National Life Insurance Co., 824 F.2d 277, 281 (3d Cir. 1987).

However, when an appeal concerns only issues of law, we are free

to enter an order directing the district court to enter summary

judgment in favor of the appellant.  Kreimer v. Bureau of Police

for the Town of Morristown, 958 F.2d 1242, 1250 (3d Cir. 1992).

Here, there are no genuine issues of material fact because of the Amended Stipulation entered into by the parties.  The only issue that remains is the interpretation and application of the ADA and 28 C.F.R. § 130.35(d).  Accordingly, we will vacate the order granting summary judgment in favor of defendant and remand this case to the district court for entry of an order granting summary judgment to Idell S. and against DPW.