KATHLEEN S., et al.

v.

DEPARTMENT OF PUBLIC WELFARE
OF THE COMMONWEALTH OF
PENNSYLVANIA, et al.

No. CIV. A. 97–6610.

United States District Court,
E.D. Pennsylvania.

June 26, 1998.

**462**

Robert W. Meek, Robin Resnick, Disabilities Law Project, Philadelphia, PA, Mark J. Murphy, Disabilities Law Project, Pittsburgh, PA, for Plaintiffs.

Barry N. Kramer, Howard Ulan, Daniel Fellin, Dept. of Public Welfare Office of Legal Counsel, Philadelphia, PA, for Defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiffs are a class who were residents of Haverford State Hospital as of August 26, 1997. Haverford State Hospital is a state-operated psychiatric hospital located in Delaware County, Pennsylvania. Plaintiffs bring this class action against the Department of Public Welfare of the Commonwealth of Pennsylvania and Feather O. Houstoun in her official capacity as Secretary of Public Welfare (collectively "DPW"). On February 25, 1998, this Court certified a Plaintiff class including all persons institutionalized at Haverford State Hospital as of August 26, 1997, the date that the Commonwealth announced the closure of Haverford State Hospital, which is scheduled for next Tuesday, June 30, 1998.

The Court held a bench trial which commenced on May 11, 1998. In connection therewith, the Court makes the following findings of fact and conclusions of law.

The members of the Plaintiff class are all individuals with mental illness. In their amended complaint filed December 15, 1997, they allege violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101 *et seq.* The Plaintiff class alleges that DPW is in violation of the ADA because the class members have been discriminated against through DPW's failure to provide them with services in the most integrated setting appropriate to their needs, in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d). The Plaintiff class also alleges that DPW is in violation of the ADA in that it has utilized discriminatory methods of administration by failing to appropriately plan for the development of community services wherein the mentally ill can receive appropriate treatment within a reasonable time of their having been declared appropriate for community placement. Plaintiffs allege that DPW's past methods of administration have had the effect of discriminating against class members who have been or should have been evaluated as appropriate for community placement in that these methods of administration have subjected class members to continued, unnecessary segregation in an institution, in

violation of 28 C.F.R. § 35.130(b)(3)(i). Plaintiffs seek an order of this Court declaring that DPW has discriminated against class members who have been or should have been evaluated as appropriate for community placement, and mandating that DPW provide them with community-based services at dates earlier than those planned by DPW.

On August 26, 1997, Secretary of Public Welfare Feather Houstoun announced DPW's decision to close Haverford State Hospital on or before June 30, 1998. In her announcement Secretary Houstoun stated:

> The closure of Haverford State Hospital reflects a statewide and national trend in placing people with mental illness in community settings rather than in institutions[.] In 1969 we had 27,500 patients in care in 17 state hospitals and two long-term care facilities. Following today's closure of Haverford State Hospital, 3,900 patients will be in care in nine state hospitals and one long-term care facility in the Commonwealth.

Secretary Houstoun further noted that the decision was "necessary, cost-effective and appropriate to serving the needs of people living with mental illness," and that "[a]n integrated system of community and residential support ... makes good sense for the consumer, the taxpayer and the entire community." Secretary Houstoun also stated that persons who have been discharged from state-operated institutions "are better able to maintain a safe and decent quality of life outside of an institutional setting."

Indeed, there appears to be consensus among professionals in the field of mental health that most, if not all, people with serious and persistent mental illness can be successfully and safely served in the community, if the appropriate services and supports are provided. During the past twenty-five years, the number of persons residing in state psychiatric hospitals has decreased as a result of the development of effective new medications, and the development and expansion of alternative community treatment programs. According to Charles Currie, Deputy Secretary for DPW's Office of Mental Health and Substance Abuse Services, it is DPW's vision that "all individuals with seri-

ous mental illness have the opportunity to live their lives in the community."

Although the decision to close Haverford State Hospital was not announced until August 1997, the closure of Haverford State Hospital had been contemplated since at least June 1994, when the Southeast Region Task Force (the "Task Force") was convened by former Secretary of Public Welfare Karen Snider. The Task Force was charged with "the goal of developing a five-year plan for the operation and utilization of Haverford State Hospital and Norristown State Hospital with the specific objective of further integrating the resources of these facilities with community mental health programs." The Task Force's voting members included mental health consumers (i.e. mentally ill individuals who utilize the services of the Commonwealth's mental health system), family members of the mental health consumers, and mental health professionals. The Task Force's non-voting members included representatives of Haverford State Hospital and Norristown State Hospital staff, union representatives, and other professionals. DPW and county mental health staff provided technical support to the Task Force.

The Task Force issued a report (the "Task Force Report") on November 9, 1994. The Task Force Report noted that the Commonwealth had adopted a conceptual framework for the treatment of the mentally ill called the Community Support Program, a model designed specifically for individuals with severe and persistent mental illness. A basic tenet of the Community Support Program model is that the community is the preferred locus for mental health treatment and support. Inpatient care is designated for evaluation and short term stabilization, except for a small number of individuals who may need longer term hospitalization.

The Task Force Report reported that the Commonwealth had begun re-structuring its mental health system with the goal of creating an integrated system of care. That restructuring included the closing of Philadelphia State Hospital, which was unique in that, for the first time, funding that previously supported a state hospital was used to

create a network of new and innovative community programs for the consumers who were in the hospital and for those who would have used the hospital had it remained open. As a result, the same level of funding that once supported approximately 500 people in Philadelphia State Hospital was used to provide community-based care for 450 former residents and a minimum of 1500 additional consumers who had been diverted from state hospitalization. The Task Force Report also reported a very low recidivism rate for consumers who had been discharged to the sorts of programs that were developed in connection with the closing of Philadelphia State Hospital.

The Task Force concluded that many state hospital residents "had stabilized to the point where a less structured residential setting could provide the necessary supports for a successful community placement." The Task Force Report stated that "[t]he counties agree that most of the people currently residing in Haverford State Hospital and Norristown State Hospital can be served in community-based settings with adequate supports, to be developed over the next five years." The Task Force recommended consolidating Haverford State Hospital and Norristown State Hospital into one facility.

Attached to the Task Force Report were funding proposals from the five southeastern Pennsylvania counties (Delaware, Chester, Bucks, Montgomery and Philadelphia) to the Commonwealth, which provides the bulk of funding for community-based mental health services. The Task Force recommended implementing and funding these proposals, known as CHIPP, or Community Hospital Integration Project Programs. CHIPP is a funding program in addition to DPW's general mental health allocations to the counties for community-based services. Through CHIPP, DPW allocates funding to a particular county or counties for the specific purpose of developing the resources necessary to discharge residents of those counties from state psychiatric hospitals. CHIPP is designed to assure that the infrastructure for interventions and treatments in the community is in place in order to accommodate and support individuals as they are discharged from state institutions. CHIPP projects always link the provision of community-based services to the closure of beds in the state psychiatric facilities, and CHIPP has been the primary avenue for expansion of community-based care, especially for persons with serious and persistent mental illness. CHIPP is funded completely by the Commonwealth.

In its CHIPP proposal attached to the Task Force's 1994 Report, Chester County proposed to develop community-based services to allow for the discharge of twelve state hospital residents in each of the five years of the Task Force's proposed plan. Delaware County, which estimated that 80% of its residents in state hospitals could be served in the community, submitted a five-year CHIPP proposal to develop community-based services to allow for the discharge of an average of 40 residents per year (with fewer in the first year and increased numbers in subsequent years). These CHIPP proposals, if approved, would have allowed development of community services for most Chester and Delaware county residents institutionalized at Haverford State Hospital.

In November 1994, the Task Force shared its Report with the administration of the new Governor-elect and requested action upon its recommendations. However, the administration took no action on the Task Force Report until 1997. In January 1997, Deputy Secretary Curie convened the Southeast Region Mental Health Steering Committee (the "Steering Committee") to review the recommendations of the Task Force issued in November 1994. The Steering Committee, consisting of the mental health administrators of the five southeastern Pennsylvania counties, a mental health consumer representative, and a family representative, confirmed the validity of the Task Force's 1994 recommendations.

In January 1997, the Steering Committee asked Haverford State Hospital to identify how many residents could be served outside Haverford State Hospital with no more than twelve additional months of inpatient treatment. At the meeting of the Steering Committee in March 1997, Haverford State Hospital identified approximately 225 residents

who could be served in the community. In March 1997, the Steering Committee recommended consolidating Haverford State Hospital and Norristown State Hospital and transferring the state hospital funding used for the closed hospital to county programs to develop a comprehensive community-based service system.

As early as May 1997, DPW officials expected that the consolidation of Haverford State Hospital and Norristown State Hospital would be complete by June 30, 1998. However, it was not until after DPW announced the closure of Haverford State Hospital in August 1997 that DPW requested the counties to submit plans for the closure of Haverford State Hospital and the discharge of Haverford State Hospital residents. DPW did not initially request the counties to submit multi-year plans. DPW asked the counties to submit a four-year plan on or around December 4, 1997.

In March 1998—about seven months after the announced closure of Haverford State Hospital—DPW issued its Southeast Region Community Mental Health Services Plan (the "Southeast Region Plan" or "Plan") to govern the closure of Haverford State Hospital and its consolidation with Norristown State Hospital. DPW finalized and publicly distributed the Southeast Region Plan on March 9, 1998. The Plan recognizes that "the community is the preferred locus for mental health treatment and support." DPW explained:

> Inpatient hospitalization care is designated for evaluation and short-term stabilization, except for the small number of people who may need longer-term hospitalization. Both experience and research have substantiated the effectiveness of a comprehensive community support system. Studies conducted by the National Institute for Mental Health, the Center for Mental Health Services and the University of Pennsylvania have concluded that comprehensive community support systems reduce the reliance on hospitalization and improve the level of functioning, quality of life and satisfaction of persons with severe mental illness.

After DPW announced its decision to close Haverford State Hospital on August 26, 1997, it evaluated Haverford State Hospital residents to determine which residents were appropriate for discharge to community-based programs and the types of programs they need, and which residents need continued inpatient hospitalization. Pursuant to the Southeast Region Plan, DPW's Office of Mental Health and Substance Abuse Services developed a process to assess the needs and long-range placement plans for each Haverford State Hospital resident. The individual evaluations of Haverford State Hospital residents by DPW were to have been completed by September 30, 1997. That deadline was then extended to October 31, 1997. The individual evaluations of Haverford State Hospital residents by DPW were not completed, however, until January 1998.

As heretofore pointed out, the Plaintiff class consists of 255 class members who were confined at Haverford State Hospital as of August 26, 1997, the date on which DPW announced its decision to close the hospital on June 30, 1998. The Court will divide the class members into the following three subclasses for the purposes of this memorandum and this Court's orders:

Subclass A consists of approximately 88 class members who have been identified by DPW as appropriate for community placement and concerning whom DPW has represented to the Court that these approximately 88 class members will be placed in community treatment facilities appropriate to their needs on or before June 30, 1998.

Subclass B consists of approximately 95 class members who have been identified by DPW as appropriate for treatment in the community but who have been or will be transferred to Norristown State Hospital by June 30, 1998, and for whom facilities and services are not presently available for their treatment in the community.

Subclass C consists of approximately 68 class members who have been identified by DPW as not now appropriate for treatment in the community, and who have been or will be transferred to Norristown State Hospital by June 30, 1998.

*Claims of Plaintiff Class Members*

The Plaintiff class claims that they have been discriminated against in violation of Section 202 of Title II of the Americans with Disabilities Act, and regulations promulgated thereunder by the Department of Justice, 28 C.F.R. §§ 35.130(d) and 35.130(b)(3).

Section 202 of Title II provides:

[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

ADA regulation § 35.130(d) provides as follows:

A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

28 C.F.R. § 35.130(d).

ADA regulation 35.130(b)(3) provides in pertinent part:

A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(I) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability
. . .

28 C.F.R. § 35.130(b)(3)

Specifically, Plaintiffs in subclass A claim that as of the date this lawsuit was filed, October 27, 1997, virtually all of the class members in subclass A were being discriminated against in violation of the ADA because they were being unnecessarily segregated at Haverford State Hospital at a time when a community placement was in fact the most integrated setting appropriate to their needs. These Plaintiffs also claim that DPW's methods of administration, specifically DPW's failure to properly plan for the necessary community-based services needed by Haverford State Hospital residents when they became appropriate for community placement, had the effect of discriminating against them in violation of the ADA in that it contributed to their continued, unnecessary segregation at Haverford State Hospital.

Plaintiffs in subclass B claim that DPW has and continues to discriminate against them because they have been unnecessarily segregated at Haverford State Hospital, and they will continue to be unnecessarily segregated at Norristown State Hospital, despite the fact that DPW has determined that a community placement is the most integrated setting available to their needs. These Plaintiffs likewise claim that DPW's methods of administration, specifically DPW's failure to properly plan for the necessary community-based services needed when they became appropriate for community placement, continues to have the effect of discriminating against them in violation of the ADA in that it has contributed to their unnecessary segregation at Haverford State Hospital and to their continued segregation at Norristown State Hospital.

Finally, Plaintiffs in subclass C claim that some of them are currently appropriate for placement in the community, although all of them have been evaluated as needing further inpatient hospitalization at Norristown State Hospital. These Plaintiffs claim that those who are presently appropriate for community placement are being discriminated against in violation of the ADA. Furthermore, Plaintiffs in subclass C claim that DPW has utilized methods of administration that have the effect of discriminating against them in that DPW failed to properly assess their needs and their readiness for community placement. In addition, these Plaintiffs also claim that to the extent they are presently appropriate for community placement, DPW's failure to properly plan for the necessary community-based services they need as they became ready for community placement had and continues to have the effect of discriminating against them in violation of the ADA in that it has contributed to their unnecessary segregation at Haverford State Hospital and to their continued segregation at Norristown State Hospital. Finally, these Plaintiffs claim that DPW has failed to provide them with appropriate treatment, which they claim has discriminated against them by causing them to remain institutionalized longer than necessary.

*The Americans With Disabilities Act*

The Americans With Disabilities Act ("ADA"), enacted in 1990, is not the first civil rights legislation for persons with disabilities. Section 504 of the Rehabilitation Act of 1973 sought to achieve much the same ends as the ADA, and its history provides insight into the intent of Congress in passing the ADA. Section 504 reads in relevant part:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...

29 U.S.C. § 794.

When the provisions of section 504 were first introduced in Congress, Representative Vanik described the need for such legislation as follows:

> [T]he treatment and regard for the rights of handicapped citizens in our country is one of America's shameful oversights ... The masses of the handicapped live and struggle among us, often shunted aside, hidden and ignored ... Today, the handicapped are generally a hidden population. Only the most daring and brave risk the dangers and suffer the humiliations they encounter when they try to live normal, productive lives. But the time has come when we can no longer tolerate the invisibility of the handicapped in America.

117 Cong.Rec. 45974 (1971).

The late Senator Humphrey similarly commented that such legislation was needed

> to insure equal opportunities for the handicapped by prohibiting needless discrimination in programs receiving Federal financial assistance.... The time has come when we can no longer tolerate the invisibility of the handicapped in America.... These people have the right to live, to work to the best of their ability—to know the dignity to which every human being is entitled.... These are people who can and must be helped to help themselves.

118 Cong.Rec. 525 (1972).

However, for various reasons, section 504 did not achieve its purpose of ending disabilities-based discrimination. As stated by Judge McKee in *Helen L. v. DiDario*, "[a]lthough Section 504 has been called 'the cornerstone of the civil rights movement of the mobility-impaired,' ... its shortcomings and deficiencies quickly became apparent." 46 F.3d 325, 330 (3rd Cir.1995) (citations omitted). *See also* Cook, *The Americans with Disabilities Act: The Move to Integration,* 64 Temp.L.Rev. 393, 394–408 (1991)(The Rehabilitation Act and its regulations have been practically a dead letter as a remedy for segregated public services).

One reason that Section 504 has not been successful in eliminating discrimination against the disabled is because it has been ineffectively enforced by many government agencies charged with such enforcement. Tucker, *Section 504 of the Rehabilitation Act After Ten Years of Enforcement: The Past and the Future,* 1989 U.Ill.L.Rev. 845, 853–883 (1989). In addition, the limited scope of section 504, which prohibits discrimination only on the part of recipients of federal financial assistance, has led to its ineffectiveness. *Id.* at 906–908. *See also* Burgdorf, *The Americans with Disabilities Act: Analysis and Implications of a Second–Generation Civil Rights Statute,* 26 Harv.C.R.—C.L.L.Rev. 413, 431 (1991)(the weaknesses of section 504 arise from its statutory language, the limited extent of its coverage, inadequate enforcement mechanisms and erratic judicial interpretations).

In 1986, the National Council on Disability, an independent Federal agency whose members were appointed by the President and confirmed by the Senate, issued a report entitled "Toward Independence." The Council stated that "[p]eople with disabilities have been saying for years that their major obstacles are not inherent in their disabilities, but arise from barriers that have been imposed externally and unnecessarily." The report went on to recommend that "Congress ... enact a comprehensive law requiring equal opportunity for individuals with disabilities, with broad coverage and setting clear, consistent, and enforceable standards prohibiting discrimination on the basis of handicap."

■ Based on that recommendation, in 1988 the Americans with Disabilities Act was

first introduced in Congress. From the comments of the ADA's sponsors when introducing the Act, it is clear that Congress intended to remedy the problems with Section 504 and to reaffirm its intention to eliminate discrimination against the disabled. In particular, these comments make clear that unnecessary segregation of the disabled in America continued to be a major form of discrimination facing the disabled, and that through the ADA, Congress intended to ensure that the disabled be given the opportunity for more true and full integration into the mainstream of American life. Senator Simon's comments are typical in describing the discrimination still faced by the disabled and thus the need for further legislation:

In spite of progress resulting from laws such as ... the Rehabilitation Act, this sizeable part of our population remains substantially hidden. They are hidden in institutions. They are hidden in nursing homes. They are hidden in the homes of their families.... Because they are hidden, we too easily ignore the problem and the need for change.

134 Cong.Rec. 9384 (1988).

Based on extensive testimony from people with disabilities, Congress recognized that the then-current disability laws were "inadequate" in overcoming "the pervasive problems of discrimination that people with disabilities are facing." S.Rep. No. 116, 101st Cong., 1st Sess. 18 (1989); H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 47 (1990). Both branches of Congress concluded:

[T]here is a compelling need to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities and for the integration of persons with disabilities into the economic and social mainstream of American life. Further, there is a need to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities.

S.Rep. No. 116, 20; H.R.Rep. No. 485(II), 50. It was against this backdrop that Congress passed the Americans with Disabilities Act in 1990.

In passing the ADA, Congress provided for implementation regulations. The ADA directs the Attorney General to promulgate regulations necessary to implement Title II of the ADA. 42 U.S.C. § 12134(a). The Act further requires that those regulations be consistent with the coordination regulations under section 504 of the Rehabilitation Act. 42 U.S.C. § 12134(b). The ADA's "integration regulation," § 35.130(d), provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). This regulation is almost identical to 28 C.F.R. § 41.51(d), promulgated in 1981 under section 504, which mandates that all recipients of federal financial assistance "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons."

█ As the foregoing analysis makes clear, in passing the ADA, Congress intended to reiterate and strengthen its mandate, first established with the passage of section 504 and its regulations, that the rights of the disabled be fully respected, that discrimination in the form of segregation be ended once and for all, and that people with disabilities be integrated—to the greatest extent possible—into the mainstream of American life. The Third Circuit came to the same conclusion in *Helen L. v. DiDario*, 46 F.3d 325 (3rd Cir.1995).

In *Helen L.*, the Third Circuit interpreted § 35.130(d) as mandating the integration of unnecessarily segregated disabled persons. 46 F.3d at 332. The Third Circuit held that the Department of Public Welfare of the Commonwealth of Pennsylvania violated the ADA by requiring that the Plaintiff receive care in a nursing home rather than in her own home through an attendant care program for which she was qualified.

In so holding, the Third Circuit determined that the Attorney General's regulations should be given substantial deference "[b]ecause Title II was enacted with broad language and directed the Department of Justice to promulgate regulations ..." *Helen L.*, 46 F.3d at 331. Further, the Third Circuit observed that Congress had explicitly

directed the Attorney General to follow the Section 504 coordination regulations in promulgating ADA regulations. In so doing, the Third Circuit reasoned, Congress voiced its approval of the integration mandate in Section 504, thereby giving the ADA integration mandate promulgated by the Attorney General "the force of law." *Id.* at 332.

The Third Circuit also examined the intent of Congress in passing the ADA, and noted that Congress itself had identified segregation as a form of continuing discrimination against the disabled. *Id.* at 332. The Third Circuit noted that Congress intended the ADA to extinguish unnecessary segregation of people with disabilities, and to encourage the full integration of people with disabilities in society. *Id.* at 332–33. Thus, the Third Circuit concluded, "the ADA and its attendant regulations clearly define unnecessary segregation as a form of illegal discrimination against the disabled." *Id.* at 333. *See also Charles Q. v. Houstoun,* 1996 WL 447549 (M.D.Pa.).

Recently, the Eleventh Circuit followed the Third Circuit's lead in *Helen L.* in *L.C. by Zimring v. Olmstead,* 138 F.3d 893 (11th Cir.1998). In that case, two state psychiatric hospital residents, L.C. and E.W., challenged their continued confinement in an institution and the state's failure to provide them with appropriate, community-based services. The Eleventh Circuit found "overwhelming authority in the plain language of Title II of the ADA, its legislative history, the Attorney General's Title II regulations, and the Justice Department's consistent interpretation of those regulations" to support the plaintiffs' position. 138 F.3d 893, 894. The Eleventh Circuit further wrote:

> By definition, where, as here, the State confines an individual with a disability in an institutionalized setting when community placement is appropriate, the State has violated the core principle underlying the ADA's integration mandate. Placement in the community provides an integrated treatment setting, allowing disabled individuals to interact with non-disabled persons—an opportunity permitted only under limited circumstances within the walls of segregated state institutions ...

*Id.* at 896. The Eleventh Circuit also acknowledged that "the denial of community placements to individuals with disabilities such as L.C. and E.W. is precisely the kind of segregation that Congress sought to eliminate." *Id.* The Eleventh Circuit ruled that "[t]he State's failure to place L.C. and E.W. in the community ... falls squarely within the ADA's ban on disability-based discrimination," *id.* at 901, and explained:

> Under § 35.130(d), the failure to provide the most integrated services appropriate to the needs of disabled persons constitutes unlawful disability-based discrimination—even though such services may not be needed by nondisabled individuals—because such segregation perpetuates their status as second-class citizens unfit for community life.

*Id.* at 899.

It is also of interest to note that on June 15, 1998, the United States Supreme Court affirmed the holding of the Third Circuit by a unanimous opinion in *Pennsylvania Department of Corrections v. Yeskey* in holding that the "plain text of Title II of the Americans With Disabilities Act unambiguously extends to state prison inmates" in the Commonwealth of Pennsylvania. —— U.S. ——, ——, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998). Only yesterday (June 25, 1998) the United States Supreme Court in *Bragdon v. Abbott* made it abundantly clear that the ADA is a civil rights law applicable to all individuals who come within the ADA's definition of disability. —— U.S. ——, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

■ DPW claims that this Court lacks jurisdiction on the ground that Plaintiffs have presented no justiciable case or controversy. As heretofore pointed out, Title II of the ADA, 42 U.S.C. § 12131–12134, prohibits disability-based discrimination against persons with disabilities by public entities. There is no doubt that Defendant DPW is a public entity subject to the requirements of Title II. There is no dispute that all the members of the Plaintiff class have an impairment, i.e. mental illness, which substantially limits their major life activities. There is therefore no question that members of the Plaintiff

class are "individuals with disabilities" protected by the ADA. The contention that this Court is without jurisdiction can be characterized as disingenuous.

■ DPW also asserts that the *Rooker–Feldman* doctrine divests this Court of subject matter jurisdiction over the claims of those members of the Plaintiff class who have been involuntarily committed pursuant to state law. As clearly pointed out by the Third Circuit in *Ernst v. Child and Youth Services of Chester County*, a federal proceeding is banned by the *Rooker–Feldman* doctrine "only when entertaining the federal claim would be the equivalent of an appellate review of [a state court] order." 108 F.3d 486, 491 (3rd Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 139, 139 L.Ed.2d 87 (1997). It is clear that the *Rooker–Feldman* doctrine has no application to these proceedings.

DPW also claims that the Plaintiff class members who are involuntarily committed pursuant to state law are in effect petitioning for a writ of habeas corpus, and, additionally, that this Court should refrain from considering claims of the Plaintiff class on the basis of the *Younger* abstention doctrine. Neither of these two claims merits discussion.

DPW further claims that the Plaintiff class is seeking "deinstitutionalization." Plaintiffs make no such claim. It is clear that the Plaintiff class claims that DPW has violated the mandate of the Congress of the United States as set forth in the ADA in that DPW has discriminated and is continuing to discriminate against members of the class by DPW's failure to provide services in the most integrated setting appropriate to their needs. As heretofore pointed out, it was the Commonwealth of Pennsylvania which announced to the world on August 26, 1997, DPW's decision to close Haverford State Hospital on or before June 30, 1998. In DPW's announcement, it was pointed out that the closure of Haverford State Hospital reflected a state-wide and national trend in placing people with mental illness in community settings rather than in institutions, and that in 1969 "we had 27,500 patients in care in 17 state hospitals and two long-term care facilities," and that following "today's closure of Haverford State Hospital, 3900 patients will be in care in nine state hospitals and one long-term care facility in the Commonwealth." The announcement of the closure of Haverford State Hospital also pointed out "this will ensure a seamless transition of patients from Haverford State Hospital and Norristown State Hospital into regional community placement where appropriate." The announcement went on to state that "since January of this year we have carefully analyzed our entire state hospital system, and today's decision reflects a re-organization that is necessary, cost-effective and appropriate to serving the needs of people living with mental illness. Because of medical advances and our success in developing community-based programs, our state hospital census has been declining dramatically." The announcement also added that the cost of caring for patients in state hospitals has "risen to nearly $100,000 a year per patient." The announcement concluded that "an integrated system of community and residential support as illustrated in today's activities makes good sense for the consumer, the taxpayer and the entire community." It is abundantly clear that the Plaintiffs in this legal action are claiming "discrimination" on the basis of the ADA, and are not seeking an order to "deinstitutionalize."

■ Finally, DPW claims that planning for and providing adequate community services and facilities for the treatment of class members is not required under the ADA, pointing out that the Department of Justice's regulations provide:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

This Court recognizes that the process of providing community services and facilities for the treatment and care of the residents of Haverford State Hospital requires planning, and that undue haste in placing eligible residents of the hospital into the community will

not be conducive to their mental health treatment. However, the planning and preparation of community services and facilities for eligible residents of Haverford State Hospital and Norristown State Hospital does not require a "fundamental alteration" of DPW's services, programs or activities. The Commonwealth of Pennsylvania, in enacting the Mental Health Procedures Act in 1977, clearly stated that in treating the mentally ill, "in every case, the least restrictions consistent with adequate treatment shall be employed." 50 P.S. § 7102. The Mental Health and Mental Retardation Act of 1966 provides that among the responsibilities and duties of the Commonwealth is to "assure within the State the availability and equitable provision of adequate mental health ... services for all persons who need them, regardless of religion, race, color, national origin, settlement, residence, or economic or social status." 50 P.S. § 4201(1).

The Court finds that complying with the ADA's integration mandate does not require a fundamental alteration of the services that the Commonwealth requires DPW to furnish in connection with community placement. As the Third Circuit stated in *Helen L.*, the Court "fail[s] to see how compliance with 28 C.F.R. § 35.130(d) requires DPW to fundamentally alter its [mental health] program[s].... On the contrary, the relief that [Plaintiffs are] requesting merely requires DPW to fulfill its own obligation under state law. This is not 'unreasonable.' " *Helen L.*, 46 F.3d at 338.

As pointed out by the Eleventh Circuit in *L.C. by Zimring v. Olmstead,* the burden of proving fundamental alteration is on the Defendants. 138 F.3d 893, 1998 WL 163707, *11. ADA regulation § 35.130(b)(7) clearly provides that "[a] public entity *shall make reasonable modifications* ... to avoid discrimination on the basis of disability, *unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.*" 28 C.F.R. § 35.130(b)(7)(emphasis added). The Court finds that the Defendant DPW has produced no evidence which would reasonably support a finding that providing appropriate community facilities and services

to the members of the Plaintiff class would result in a fundamental alteration of DPW's mental health system.

*Subclass A*

■ As heretofore pointed out, subclass A consists of approximately 88 class members who have been identified by DPW as appropriate for community placement and concerning whom DPW has represented to the Court that these approximately 88 class members will be placed in community treatment facilities appropriate to their needs on or before June 30, 1998. Plaintiffs filed this lawsuit on October 27, 1997, and on that date and prior to that date, the Court finds that virtually all of these approximately 88 disabled individuals were being discriminated against in violation of § 202 of Title II of the ADA and regulations 28 C.F.R. §§ 35.130(d) and 35.130(b)(3), in that they were being unnecessarily segregated at Haverford State Hospital at a time when a community placement was in fact the most integrated setting appropriate to their needs. The Court therefore finds that DPW has violated the rights of these approximately 88 class members under the ADA's integration mandate by failing to provide them with services in the most integrated setting appropriate to their needs. The Court also finds that DPW has utilized methods of administration at Haverford State Hospital which have resulted in discrimination against class members in subclass A through its failure to initiate plans sufficiently in advance to ensure the necessary placements in the community within a reasonable time after it was determined that a member of subclass A had become appropriate for community placement.

This Court will therefore enter an order directing DPW to provide, pursuant to its Plan, appropriate community treatment facilities and services on or before June 30, 1998, to the approximately 88 members of subclass A for whom it has been determined that the community is the most integrated setting appropriate to their needs. The Court will further order DPW to file a report with the Court on or before July 31, 1998, with a copy to Plaintiffs' counsel, of the individuals in subclass A, setting forth their name by full first name and only the first initial of their

last name, together with the location of the community services being provided to each and a statement of the treatment each is receiving in the community.

*Subclass B*

■ Subclass B consists of approximately 95 class members who have been identified by DPW as appropriate for treatment in the community but who have been or will be transferred to Norristown State Hospital by June 30, 1998 and for whom facilities and services are not presently available for their treatment in the community. The Court finds that these approximately 95 class members have been and are being discriminated against by DPW in violation of § 202 of Title II of the ADA, 42 U.S.C. § 12132, and regulation 28 C.F.R. § 35.130(d), in that DPW has subjected them to discrimination in Haverford State Hospital and Norristown State Hospital through DPW's failure to provide services in the most integrated setting appropriate to the needs of these class members.

■ There can be no doubt, and the Court holds, that these approximately 95 class members have been discriminated against in violation of the ADA's integration mandate, 42 U.S.C. § 12132, 28 C.F.R. § 35.130(d), through their continued, unnecessary segregation at Norristown State Hospital. There is no dispute that all of the types of community services and programs needed by class members exist in the community, nor is it disputed that members of this subclass are presently eligible for these community services and programs. As claimed by DPW, the only reason that these approximately 95 class members have been or will be transferred by DPW to Norristown State Hospital is that there are not presently available a sufficient number of community placements to accommodate their needs in the community. DPW claims it will take the Commonwealth up to three years, or until June 30, 2001, to obtain adequate community placements for these members of subclass B. On the other hand, Plaintiffs claim that members of this subclass could all be placed in community treatment facilities on or before December 31, 1999 (eighteen months from the closure date of Haverford State Hospital). DPW's Plan constitutes an average

placement rate of about three class members per month. Plaintiffs, on the other hand, contend that placement of these approximately 95 class members could be accomplished at an average placement rate of five class members per month.

The Court finds that the placement rate planned by DPW is unreasonable and imposes an unnecessary period of discrimination for the approximately 95 members of subclass B. There is no question that undue haste may produce a lack of appropriate care. However, the mandate of Congress is clear that DPW must provide services in the most integrated setting appropriate to the needs of each class member, and the Commonwealth's failure in the past to properly plan for the appropriate community treatment facilities and services needed by each class member should not result in years of continued discrimination.

The Court finds that DPW is capable of successfully and safely placing each member of subclass B in an appropriate community facility on or before December 31, 1999. The Court finds that it is reasonable to conclude that DPW's experience in closing Philadelphia State Hospital is instructive. The announcement to close Philadelphia State Hospital came in December 1987, and the hospital closed its doors on June 30th, 1990. There were approximately 500 residents of Philadelphia State Hospital at the time of the closure announcement, and 350 of them were placed in the community in two and a half years, at an average rate of slightly over eleven and a half placements per month. However, it is agreed by the parties that the placement of the 350 residents in two and a half years was not conducive to the well-being and safety of the disabled residents, and that the remaining 120 residents of Philadelphia State Hospital were successfully and safely placed in the community over the course of fifteen months, i.e. at an average rate of eight community placements per month.

DPW has demonstrated that it is capable of safely transferring disabled state hospital residents for treatment in the community at an average rate of eight per month. Coinci-

dentally, this is the average rate at which DPW has placed the approximately 88 class members in subclass A between August 1997 and June 1998. Furthermore, the parties are in agreement that much was learned through the Philadelphia State Hospital experience, and there is no dispute between the parties that the level of expertise concerning the provision of community services to disabled individuals with mental illness has increased considerably since the closure of Philadelphia State Hospital more than seven years ago. The Court therefore finds that DPW's current plan to transfer the approximately 95 class members in subclass B within three years is unreasonable. The Court will therefore adopt the recommendation of the Plaintiffs that appropriate community facilities can be found for each of the approximately 95 members of subclass B in eighteen months, that is no later than December 31, 1999.

██ The Court also finds that DPW has utilized methods of administration at Haverford State Hospital which have resulted in discrimination against class members in subclass B through its failure to initiate plans sufficiently in advance to ensure the necessary placements in the community within a reasonable time after it was determined that a member of subclass B would become appropriate for community placement. The Court finds that DPW's failure to adequately plan for the community placements needed by these class members has caused their continued, unnecessary segregation at both Haverford State Hospital and Norristown State Hospital. DPW has failed in the past to transfer funds from the institution to the community to assure prompt community placements for appropriate class members. DPW has authority to shift funding, as needed, between institutional and community services. Thus, there is nothing to preclude DPW from shifting the cost of treatment of class members from the institution to the community. Nevertheless, DPW in recent years has repeatedly declined requests, either *in toto* or in substantial part, from Delaware and Chester counties for CHIPP programs that would allow for transfer of appropriate Haverford State Hospital residents to the community. Between Fiscal Year 1992–1993 and Fiscal Year 1996–1997, Delaware County requested CHIPP funding that would have allowed for the community placement of 160 Haverford State Hospital residents; during that time period, DPW provided Delaware County with CHIPP funding to allow for community placement of only 21 Haverford State Hospital residents—13% of its requests. Similarly, DPW did not provide Chester County with full funding of its CHIPP proposals submitted in Fiscal Year 1992–1993 and Fiscal Year 1996–1997. Indeed, Chester County did not even bother to submit CHIPP proposals during many years based on the understanding (consistent with Delaware County's experience) that DPW would not be funding CHIPP programs in southeastern Pennsylvania during those years. If DPW had fully funded Delaware and Chester counties' CHIPP requests, most class members would have been placed in the community by now and would not remain unnecessarily segregated in institutional environments.

For these reasons, the Court holds that DPW has engaged in methods of administration which have the effect of discriminating against class members by contributing to their continued and unnecessary segregation at Haverford State Hospital and now at Norristown State Hospital, in violation of the ADA, 28 C.F.R. § 35.130(b)(3).

This Court will therefore enter an order directing DPW to proceed immediately, with the cooperation of the counties, to provide community treatment facilities and services appropriate to the needs of each of the approximately 95 members of subclass B for whom it has been determined that the community is the most integrated setting appropriate to their needs. It will further be ordered that each member of subclass B shall be placed in an appropriate community setting on or before December 31, 1999. The Court will also order that DPW shall have a psychologist or psychiatrist periodically evaluate the approximately 95 members of subclass B who are in Norristown State Hospital awaiting community placement for the purpose of determining whether the treatment they are receiving at Norristown State Hos-

pital is appropriate, and if the treatment is not appropriate, DPW shall take immediate measures to assure appropriate treatment.

DPW will also be directed to file a report with the Court, on or before July 31, 1998, with a copy to Plaintiffs' counsel, of the individuals in subclass B, setting forth their full first name and only the first initial of their last name. The Court will further order that on September 1, 1998, and on the first of each month thereafter, DPW shall file a report with the Court, with a copy to Plaintiffs' counsel, setting forth a list of the class members of subclass B who are receiving appropriate services in the community, together with the location of the community services being provided to each and a statement of the treatment each is receiving in the community.

*Subclass C*

██ Subclass C consists of approximately 68 class members who have been identified by DPW as not now appropriate for treatment in the community, and who have been or will be transferred to Norristown State Hospital by June 30, 1998. Although DPW's evaluation determined that all of the approximately 68 members of subclass C were not currently appropriate for community placement, the evidence submitted, both stipulations by DPW and evaluations performed by Plaintiffs' expert, identified several members of subclass C for whom the community, not a state hospital, is the most integrated setting appropriate to their needs. Nonetheless, DPW plans to transfer all of the approximately 68 members of this subclass to Norristown State Hospital on or before June 30, 1998 for continued inpatient hospitalization, and the Commonwealth's plans make no provision for the community placement of any one of these individuals.

The Court finds that DPW is discriminating against those members of subclass C who are presently appropriate for community placement in violation of the ADA, 42 U.S.C. § 12132 and regulation 28 C.F.R. § 35.130(b)(3), by failing to provide those members of subclass C with services in the most integrated setting appropriate to their needs.

██ Furthermore, in view of the diversity of opinion of the experts in connection with the approximately 68 members of subclass C as to the number of members who are presently appropriate for services in the community, the Court has determined that in the interests of justice, the members of subclass C should be reevaluated no later than December 31, 1998, for the purpose of determining which members of this subclass are appropriate for community placement, with the understanding that as to any member of subclass C who is found appropriate for community placement, plans should be initiated by DPW to have that person transferred to an appropriate community treatment facility within a reasonable period of time, which the Court has determined to be no later than eighteen months after the particular class member has been determined appropriate for treatment in the community.

Therefore, the Court will enter an order that DPW shall assure that all class members in subclass C are evaluated by an independent psychiatrist or psychologist on or before December 31, 1998. The independent psychiatrist or psychologist shall be selected by mutual agreement of Plaintiffs and DPW, and DPW shall pay the costs of such independent evaluations. The independent psychiatrist or psychologist shall determine which members of subclass C are appropriate for community placement and the appropriate treatment which said members should receive in the community. The independent psychiatrist or psychologist shall also determine whether the treatment each member of subclass C is receiving at Norristown State Hospital is appropriate. A written report (identifying the class member by full first name and only the first initial of the last name) of the evaluation and conclusions reached by the independent psychiatrist or psychologist shall be provided to counsel for the parties and filed with the Court upon completion of each evaluation.

The Court will further order that DPW shall provide appropriate community services to all class members in subclass C for whom the independent psychiatrist or psychologist determines that the class member is appropriate for community placement and the ap-

propriate treatment which said class member should receive in the community, no later than eighteen months after that determination is made. Finally, the Court will order that on January 1, 1999, and on the first of each month thereafter, DPW shall file a report with the Court, with a copy to Plaintiffs' counsel, setting forth a list of the class members of subclass C who are receiving appropriate services in the community, together with the location of the community services being provided to each and a statement of the treatment each is receiving in the community.

*Cost of Community Services*

The provision of community-based services to those class members for whom such services are appropriate will not result in additional, unreasonable expenditures by the Commonwealth. The evidence establishes that DPW's decision to fund Community Hospital Integration Program Projects [CHIPP] and its decision to close Haverford State Hospital and to fund CHIPP programs for class members in the community were premised on the fact that it is less costly to provide mental health services to consumers in the community rather than in institutions. In fact, Secretary Houstoun in announcing DPW's decision to close Haverford State Hospital and to develop community placements for many Haverford State Hospital residents, stated that the decision was "cost-effective" and "makes sense for ... the taxpayer."

More specifically, the evidence establishes that the annual per person cost of care at Haverford State Hospital and Norristown State Hospital is, respectively, $110,960 and $113,515. DPW bears virtually the entire cost of care for persons in state hospitals. 50 Pa.Cons.Stat. § 4507(a)(1). In contrast, the cost to the Commonwealth for community-based mental health services is far lower. DPW's current plan calls for annualized payments by DPW's Office of Mental Health and Substance Abuse Services to counties in the amount of $65,000 to $66,000 per Haverford State Hospital resident who is placed in the community. Additional service costs for these individuals upon their transfer to the community will not be borne entirely by the

Commonwealth; the federal government and the counties will be responsible for part of those costs. Accordingly, the evidence shows that the cost to DPW to serve class members in the community is less than the cost of care borne by DPW for those individuals at Haverford State Hospital and Norristown State Hospital.

*Conclusion*

Justice Marshall in 1985 in *Alexander v. Choate* stated, "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." 469 U.S. 287, 295, 105 S.Ct. 712, 717, 83 L.Ed.2d 661 (1985). As pointed out by the Third Circuit in 1995 in *Helen L.*, "[b]ecause the ADA evolved from an attempt to remedy 'benign neglect' resulting from the 'invisibility' of the disabled, Congress could not have intended to limit the Act's protections and prohibitions to circumstances involving deliberate discrimination.... [T]he ADA attempts to eliminate the effects of that 'benign neglect,' 'apathy,' and 'indifference.' " 46 F.3d at 335. The ADA does not mandate a finding of intentional discrimination.

The Court does not find in this case that the actions of the Secretary of DPW or the employees of DPW were or are intentional. As heretofore pointed out, however, in the programs undertaken by DPW to close hospitals for the mentally ill, DPW has apparently been apathetic and indifferent to the mandate of Congress set forth in the ADA and the regulations of the Department of Justice enacted to make certain that individuals with disabilities are to be provided with services in the most integrated setting appropriate to their needs, and are not to be discriminated against by being unnecessarily segregated in the institution. As stated by the Court in *Charles Q. v. Houstoun* in commenting on the holding of the Third Circuit in *Helen L.*:

> In reaching this result, the Court rejected the argument that the ADA required intentional discrimination. It found that the Act was meant to overcome the benign neglect and apathy that often resulted in the disparate treatment of disabled per-

sons ... Accordingly, the "unnecessary segregation of individuals with disabilities in the provision of public services," was sufficient discrimination under the ADA. 1996 WL 447549, *3 (M.D.Pa.) (citations omitted).

The denial of community placements to individuals with disabilities such as the members of the Plaintiff class in this action is precisely the kind of segregation that Congress sought to eliminate. DPW has violated the core principles underlying the ADA's integration mandate.